Andrew HOWARD et al., Plaintiffs,

v.

PENN CENTRAL TRANSPORTATION
COMPANY, d/b/a Consolidated Rail
Corporation, Defendant.

No. C77–1293.

United States District Court,
N. D. Ohio, E. D.

March 25, 1980.

Mark L. Hoffman, Beachwood, Ohio, for plaintiffs.

Thomas R. Skulina, Thomas A. Downie, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Plaintiff seeks to bring this action against Penn Central Transportation, Inc. (Penn Central) and Consolidated Rail Corporation (Conrail) for alleged acts of racial discrimination in violation of 42 U.S.C. §§ 1981 and 2000e, *et seq.* Numerous pending motions raise different questions. Most critical are these: on what date Conrail became a party to this suit and whether it

is liable for acts of its "predecessor," Penn Central. Because the answers to these questions will have a substantial effect on the course of this suit, the court will now rule on Conrail's motion to dismiss.[1]

On December 23, 1977 plaintiff filed this action naming as defendants the Cleveland and Chicago offices of "Penn Central Transportation Company DBA Consolidated Rail Corporation." Plaintiff alleged that:

On or about September 30, 1977, [he] was advised by the Equal Employment Opportunity Commission of his right to initiate a civil action in the appropriate Federal District Court within ninety (90) days of the receipt of said letter.

Conrail asserts that it received a copy of the complaint on or about December 30, 1977 and that pursuant to an agency agreement with Penn Central, it "accepted service of said Complaint in an agency capacity for defendant Penn Central Transportation Company." In its answer to the complaint, Penn Central specifically "denie[d] that it has ever done business as Consolidated Rail Corporation." Conrail did not file an answer; rather, appearing specially for that purpose, it moved the court to "declare its status as a non-party." It is not disputed that Penn Central does not do business as Conrail.

On July 11, 1979, plaintiff filed an amended complaint naming as defendants Penn Central Transportation Company and Consolidated Rail Corporation. Conrail claims that the amended complaint does not relate back to the date the original complaint was filed under Fed.R.Civ.P. 15(c) because the amendment adds, rather than changes, a party. Therefore, Conrail argues, the Title VII claims against it are untimely because not asserted within ninety days of the receipt of the right to sue letter issued by the EEOC. Conrail also maintains that the section 1981 claims against it are not timely with respect to any claimed acts of discrimination occurring more than six years prior to the filing of the amended

---

1. The filing of the amended complaint significantly changed the issues raised in Conrail's motion "for order declaring status as non-party" and for all practical purposes rendered it moot. The court, therefore, will not separately consider this motion.

complaint because claims relating to such acts are barred by the six-year statute of limitations applicable to section 1981 actions brought in Ohio.

Defendant Conrail further argues that it is not liable, under 42 U.S.C. § 1981 or Title VII, for any acts of discrimination committed by Penn Central. Conrail contends that under the Regional Rail Reorganization Act, pursuant to which Conrail was created, all properties of Penn Central that were conveyed to Conrail were "conveyed free and clear of any liens or encumbrances," 45 U.S.C. § 743(b)(2). Therefore, Conrail argues it cannot be held liable for discriminatory acts occurring prior to the conveyance on April 1, 1976.

Plaintiff, on the other hand, argues that Rule 15(c) does apply to the amended complaint because Conrail had notice of the suit and because the failure to sue Conrail as an independent entity resulted from a misunderstanding about the "liability relationship" between Conrail and Penn Central. Plaintiff further claims that Conrail is estopped from challenging the timeliness of the complaint.

With respect to the successorship question, plaintiff argues that successorship is not an issue because he has alleged that Conrail is itself engaged in continuing violations of Title VII and section 1981. In the alternative, plaintiff contends that the imposition of successorship liability on Conrail is not precluded by the Regional Rail Reorganization Act and is necessary to afford full relief should plaintiff prevail.

## I.

### Rule 15(c)

It is clear from the face of the amended complaint that Conrail was not named as a separate party within ninety days of the receipt of the right to sue letter. 42 U.S.C. § 2000e–5(f)(1) requires suit to be brought "within ninety days after the giving of such notice."[2] Compliance with section 2000e–5(f)(1), however, would have been made if the amendment to the complaint naming Conrail as a separate party relates back to the date the original complaint was filed.

■ Defendant Conrail relies on *Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6th Cir. 1973), for the following proposition: "The 1966 amendment to Fed.R.Civ.P. 15(c) which permits correction of misnomers does not permit the addition or substitution of new parties." Conrail argues that *Marlowe* precludes a finding that the amended complaint in this case relates back because plaintiff is attempting to add Conrail as a party to the action.

In *Marlowe* plaintiff sued his employer under Title VII and then sought to amend his complaint to add a Title VII claim against his union which was not named a defendant in the original complaint. The Sixth Circuit held the amendment did not relate back to the date the original complaint was filed. In that situation, the union was clearly a "new" party, not named or attempted to be named in the original complaint.

In this case, however, Conrail, unlike the union in *Marlowe*, was named, although incorrectly, in the complaint. A reasonable inference from the caption and wording of the complaint is that plaintiff believed Penn Central and Conrail were one and the same entity, or, put another way, that plaintiff was unaware that Penn Central and Conrail were distinct legal entities. In that sense, this case does involve a misnomer or misdescription because plaintiff has inaccurately characterized the legal status of Conrail. The original complaint refers to Penn Central dba Conrail as an on-going concern and as the company by which plaintiff was then (and is now) still employed; therefore, one could not conclude that plain-

---

**2.** Plaintiff's brief sets forth the argument that compliance with the statute of limitations requirements of Title VII is not necessary when the complaint alleges an on-going pattern of discrimination. This argument, however, as is clear from the cases cited by plaintiff, applies to the time limit for filing charges with the EEOC or an analogous state agency. It is not pertinent to the distinct requirement under 42 U.S.C. § 2000e–5(f)(1) that suit be instituted within ninety days of receiving a right to sue letter.

tiff was concerned only with the defunct Penn Central railroad operations.[3]

Therefore, the court concludes that *Marlowe* is distinguishable from this case, and that application of Rule 15(c) is not precluded. Under Rule 15(c), two conditions must be met in order for the amended complaint to relate back to the date of the original complaint. First, the claims of the amended complaint must arise out of the transaction or occurrence set forth in the original complaint. Second, it must be shown that

> within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

The first condition is met in this case since the claims raised by the amended complaint are the same as those raised by the original complaint. With respect to the question of notice, Rule 15(c) requires that notice of the institution of the suit be received within the period provided by law for instituting the action—in this case, ninety days from September 30, 1977. The ninetieth day after September 30, 1977 was December 29, 1977. The return of service indicates that plaintiff's attorney requested service of the complaint upon "Penn Central Transportation Co., DBA Consolidated Rail Corp." of "420 Williamson Bldg., 215 Euclid Ave., Cleve., O." and of "Room 632—Union Station, Chicago, Illinois." The certified mail receipt indicates that the complaint was delivered to the Cleveland office on December 29, 1977 and was received by an "S.D. Pappas." [4]

Although Conrail's brief in support of its motion for an order declaring its status as a non-party asserts that the complaint was received "[o]n or about December 30, 1977," the return receipt shows that service was received on December 29, 1977, which is within the ninety-day period. Conrail acknowledges that it "clearly had notice of plaintiff's law suit against Penn Central because it accepted service of process for Penn Central." Conrail argues, however, that it "had no notice . . . that plaintiff also intended to make Conrail a defendant."

There is no suggestion that Conrail is in any way prejudiced in its defense on the merits by the failure to receive notice earlier within the ninety-day period. With respect to whether Conrail "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [it]," there are several indications in the complaint that the on-going railroad operation was intended to be a defendant. First, the caption names as a defendant Penn Central "DBA Consolidated Rail Corporation," thereby not only naming Conrail but also indicating that plaintiff was suing an on-going concern. Second, the allegations of the complaint indicate that plaintiff is seeking relief against an on-going railroad

---

**3.** Thus, this case is also distinguishable from *Archuleta v. Duffy's, Inc.*, 471 F.2d 33 (10th Cir. 1973). In *Archuleta* plaintiff had named as defendant Denver Pop Company "formerly known as and d/b/a Duffy's Inc." The defendant intended to be named was Domenico Company now doing business as Duffy's Inc. The Domenico Company had previously bought part of Duffy's assets and changed its name to Duffy's Inc. The remainder of Duffy's Inc. had changed its name to Denver Pop Company. Thus, naming as defendant Denver Pop Company "*formerly known as and d/b/a* Duffy's, Inc." could not be construed as naming the on-going business Duffy's Inc. as a defendant.

The court notes further that the actual holding in *Archuleta* was that the "amendment can relate back to the date the complaint was filed only if the provisions of Rule 15(c) are met," and that the provisions of Rule 15(c) were not met because Duffy's Inc. was not served with a copy of the complaint within the period provided by law for bringing suit and thus had no notice of the institution of the action within that period.

**4.** A copy of the complaint was not delivered to the Chicago office until January 3, 1978.

operation. Thus, plaintiff, alleging that he "is still employed by the Defendant," complains not only of acts committed prior to April 1, 1976, but also of acts alleged to be occurring at the time the complaint was filed. Plaintiff also seeks injunctive relief against alleged on-going discriminatory practices, as well as relief for past acts. Whether plaintiff is correct in his assumption that Conrail is liable for past acts of Penn Central and his assumption that he has exhausted administrative remedies with respect to alleged on-going discriminatory acts of Conrail, the fact remains that the complaint indicates that plaintiff intended to sue an on-going railroad operation, Conrail.

Therefore, the court concludes that within the ninety-day period following September 30, 1977, Conrail received such notice of the institution of this action that it will not be prejudiced in its defense on the merits and Conrail knew or should have known that but for a mistake concerning the relationship between Penn Central and Conrail, Conrail would have been separately named as a defendant. Because the requirements of Rule 15(c) are met, the amended complaint relates back to the date the original complaint was filed, and the Title VII claims against Conrail are therefore timely. Furthermore, the section 1981 claims are not barred by the six-year statute of limitations.

## II.

### Successorship Liability

Case law dealing with the issue of successorship liability under Title VII is sparse, and under section 1981 apparently nonexistent. Likewise, there are apparently no cases dealing with the effect, if any, of the Regional Rail Reorganization Act on successorship liability of Conrail. In addressing this issue, therefore, the court writes on an essentially clean slate.

---

**5.** The court quoted from *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees and Bartenders International Union, AFL–CIO*, 417 U.S.

A starting place for the court's analysis is the Sixth Circuit's decision in *EEOC v. MacMillan Bloedel Container, Inc.*, 503 F.2d 1086 (6th Cir. 1974). In that case, charges of race and sex discrimination were filed in the EEOC against an employer, Flintkote. At some time after the charges were filed, although the exact date was unknown, the operations of Flintkote that were the subject of the EEOC charge were taken over by MacMillan. The exact nature of this transaction was unknown. When a Title VII action was brought by the EEOC against MacMillan based on the charges originally made against Flintkote, the Sixth Circuit faced the question whether "a successor company [could] be held liable for the unlawful employment practices of its predecessor."

█ Noting that Title VII was modeled after the Labor Management Relations Act, the court turned to three Supreme Court cases dealing with the issue of employer successorship under the LMRA: *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *NLRB v. Burns International Security Service, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). The court held:

> We are of the view that the considerations set forth by the Supreme Court in these three cases as justifying a successor doctrine to remedy unfair labor practices are applicable equally to remedy unfair labor practices in violation of Title VII. Each case, however, must be determined on its own facts. What is required is a balancing of the purposes of Title VII with the legitimate and often conflicting interests of the employer and the discriminatee.

503 F.2d at 1090–91.[5]

The rationale for the court's decision was as follows:

249, 262 n. 9, 94 S.Ct. 2236, 2243 n. 9, 41 L.Ed.2d 46 (1974), a passage that reads in part:
But the real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new

Failure to hold a successor employer liable for the discriminatory practices of its predecessor could emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or with an incomplete remedy. In the case where the predecessor company no longer had any assets, monetary relief would be precluded. Such a result could encourage evasion in the guise of corporate transfers of ownership. Similarly, where relief involved seniority, reinstatement or hiring, only a successor could provide it.

It is to be emphasized that the equities of the matter favor successor liability because it is the successor who has benefited from the discriminatory employment practices of its predecessor.

503 F.2d at 1091–92. The relevant considerations in determining whether a successor should be held liable were thus stated by the court:

The nature and extent of liability is subject to no formula, but must be determined upon the facts and circumstances of each case. The primary concern, however, is to provide the discriminatee with full relief. Such relief may be awarded against the successor. On the other hand, the amenability of the predecessor to suit and its ability to provide relief will be a necessary inquiry.

*Id.* at 1092.[6]

Although *MacMillan* addressed itself solely to Title VII actions, like considerations would apply to an action brought under section 1981 to remedy racial discrimination in employment. Both Title VII and section 1981 protect the right of individuals to be free of racial discrimination in employment, and both are designed to compensate individuals for employers' racially discriminatory acts. The concern for providing an adequate remedy for victims of racial discrimination when a successorship situation arises is common to both causes of action. Therefore, the court concludes that the *MacMillan* standard should be applied to the determination of successorship liability under section 1981 as well as Title VII.

■ The next issue that must be addressed is whether section 743(b)(2) of the Regional Rail Reorganization Act precludes the imposition of liability on Conrail for racially discriminatory acts of Penn Central. Section 701 of the Act and the pertinent legislative history indicate that Congress was concerned about the deterioration of rail service in the midwest and northeast regions of the United States, and particularly the insolvency and attempted reorganization of certain railroads, including Penn Central. In order to rectify a perceived "inability of the trustees of such railroads to formulate acceptable plans of reorganization," 45 U.S.C. § 701(a)(2), and to thereby continue and improve rail service through substantial federal action and assistance, the Act provided, among other things, for a reorganization of the affected railroads and for the creation of Conrail.

On April 1, 1976, pursuant to 45 U.S.C. § 743(b), various rail properties of Penn Central were conveyed to Conrail. Congress provided in 45 U.S.C. § 743(b)(2) that "[a]ll rail properties conveyed to the Corporation [Conrail] . . . shall be conveyed free and clear of any liens or encumbrances," except certain types of leases.

employer to the employees of the former owner or their representative? . . . There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.

6. The court identified nine factors to be taken into account:

Courts that have considered the successorship question in a labor context have found a multiplicity of factors to be relevant. These include: 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.

503 F.2d at 1094.

Subchapter V of the Regional Rail Reorganization Act, entitled "Employee Protection," provides in detail for the continued employment by Conrail of employees of transferor railroads, collective bargaining agreements, displacement and termination allowances, and so forth. Section 774(e) provides for the assumption by Conrail of responsibility for employees' claims arising under collective bargaining agreements of transferor railroads, pursuant to the Railway Labor Act, 45 U.S.C. § 153. Section 774(g) provides for the assumption by Conrail of responsibility for claims of employees or their personal representatives for personal injury or death against transferor railroads. Both section 774(e) and section 774(g), however, expressly provide that while Conrail is to process and pay any such claims, it is entitled to reimbursement for them from the estate of the transferor railroad and further that "[a]ny liability of an estate of a railroad in reorganization which is assumed, processed, and paid, pursuant to this subsection, by the Corporation [Conrail] . . . shall remain the preconveyance obligation of the estate of such railroad for the purposes of section 721(h)(1)."[7] 45 U.S.C. § 774(g).

Nowhere in the Regional Rail Reorganization Act or its legislative history is there any mention of employees' claims arising under the civil rights laws. Given the fact that Congress provided for Conrail's post-conveyance handling of other types of employees' pre-conveyance claims, it is possible to infer that Congress intended to make no provision for pre-conveyance claims arising under Title VII or section 1981. On the other hand, one might conclude that the failure to find any mention of such claims in the Act or its legislative history indicates that Congress simply did not consider them.

In light of the long-standing policy against race discrimination and in favor of providing adequate relief to victims of such discrimination, it is difficult to believe that Congress would have eliminated the possibility of obtaining from Conrail post-conveyance relief for pre-conveyance race discrimination without expressly so stating.

While the Regional Rail Reorganization Act reflects a congressional intent that Conrail be free from the financial burdens of transferor railroads, it at the same time reflects an intent to provide continuity of employment and protection of employees' rights, in part by Conrail's assumption of responsibility, with a right of reimbursement, for certain obligations of transferor railroads. It would be consistent with that intent to interpret section 743(b)(2) to embrace only financial encumbrances and not to preclude nonmonetary relief against Conrail for pre-conveyance claims under Title VII and section 1981. Since no statutory provision is made for Conrail to obtain loans and reimbursement for the payment of pre-conveyance civil rights claims, liability for monetary relief might interfere with Conrail's finances.[8] But nonmonetary relief, such as promotions, would not constitute an impermissible financial encumbrance.

A distinction between monetary and other relief would also result under the *MacMillan* test, since the ability of a predecessor to provide relief is a factor to be taken into consideration in determining whether the imposition of successorship liability is appropriate in a given case. To the extent monetary relief would be available against Penn Central, liability for it would not be imposed on Conrail.

Defendant Conrail argues that Penn Central is able to provide all types of relief

---

7. Section 721(h) authorizes the United States Railway Association to make loans to Conrail to meet "existing or prospective obligations of the railroads in reorganization" that the Association determines ought to be paid.

8. Case law indicates that Congress intended the financial obligations of transferor railroads to remain the responsibility of the estates of those railroads and not be passed on to Conrail unless a specific statutory exception was made. *Matter of Central R. Co. of New Jersey*, 579

F.2d 804 (3d Cir. 1978); *Matter of Erie Lackawanna Ry. Co.*, 577 F.2d 368 (6th Cir. 1978). In the interest of protecting day-to-day business and labor relations, certain exceptions were made that placed on Conrail the responsibility for processing and paying various sorts of claims. Even in these situations, however, Conrail is entitled to reimbursement, so that the ultimate financial obligation is not borne by Conrail.

should plaintiff prevail. While Penn Central may be able to provide monetary relief, it cannot provide promotions for those in the position of plaintiff who now work for Conrail;[9] other types of nonmonetary relief, such as reinstatement (not an issue in this case), would not be available if Conrail did not provide them. While Penn Central has been reorganized as the Penn Central Corporation, it is apparently no longer engaged in railroad operations and therefore would not necessarily be able to offer suitable employment or promotions for victims of racial discrimination whose jobs are (or were) railroad jobs.[10]

This case is therefore distinguishable from *Brown v. Evening News Association*, 473 F.Supp. 1242 (E.D.Mich.1979), cited by defendant Conrail. In *Brown* the court's conclusion that the predecessor, which was an on-going corporation engaged in the same line of work, could provide a "realistic remedy" for the plaintiff was premised on the fact that the plaintiff, who alleged he was not hired because of his race, initially had prayed for a job with *either* the predecessor *or* the successor.[11] That situation is clearly different from the present situation in which plaintiff is seeking a promotion to a job that exists only within the Conrail operation.

Therefore, although Conrail cannot be held liable for monetary relief, whether it can be held liable for other types of relief must be determined by an inquiry into the factors set forth in *MacMillan*. The present state of the record does not permit an adequate inquiry into these factors; therefore, the court reserves ruling on whether application of the *MacMillan* successorship doctrine is warranted on the facts of this case. The court holds only that, in the context of nonmonetary relief, application of the successorship doctrine is not precluded by the Regional Rail Reorganization Act, or by the existence of Penn Central Corporation as a potential defendant.

### III.

The court's ruling in section II deals only with the liability of Conrail for alleged dis-

---

**9.** Although plaintiff does not expressly pray for a promotion to a particular job, a request for injunctive relief in the form of promotions seems implicit from a fair reading of the complaint coupled with the prayer for "payments . . . of a sum of money equal to the differential between pay received by the Plaintiff and the class he represents on their present jobs and the pay they would have received had they not been discriminated against by the Defendant."

**10.** Defendant Conrail's brief states:

The defendant Penn Central Transportation Company, reorganized in a court approved bankruptcy proceeding as the Penn Central Corporation, is an ongoing entity and quite capable of providing full and complete relief to the plaintiff in this case without regard to Conrail's participation in the lawsuit. Attached to this memorandum is a copy of the Penn Central Corporation Annual Report and Securities and Exchange Commission Form 10K for 1978 listing its various holdings, including those in railroad companies. These holdings are substantial, both in terms of employment opportunities and financial assets.

The attached Report and 10K Form, however, clearly indicate that Penn Central Corporation "no longer operates a railroad." 10K Form, p. 2.

**11.** The court stated:

Plaintiff now claims that the most important part of the relief he is seeking is a job at Channel 4 in Detroit, although the original complaint does not ask for this relief and the amendment was made only after it became clear that the case would otherwise be dismissed. Plaintiff urges alternative forms of relief against ENA, such as money damages, a job at Channel 9 in Washington, and a job at the Detroit News, but he now in the amended complaint for the first time claims that he is entitled to the exact relief that he would have been entitled to if there had been no transfer of ownership of Channel 4 which includes a job at Channel 4. Since such a job could only be awarded under the auspices of PNSM, plaintiff now argues for this reason for the first time that the defendant must remain in the lawsuit.

* * * * * *

This is a case in which the predecessor corporation, ENA, is in a position to provide substantially all of the relief that plaintiff might eventually be entitled to and certainly all of it that the plaintiff thought was important when the suit was first filed and until the problem was called to his attention by the motion to dismiss.

473 F.Supp. at 1246, 1247.

criminatory acts on the part of Penn Central; the liability of Conrail for its own racially discriminatory acts is a distinct issue. Plaintiff apparently assumes that claims of racial discrimination on the part of Conrail under Title VII are properly before this court, and defendant Conrail has not responded to this assumption. The court notes that the EEOC's finding of probable cause was made on September 28, 1976, about six months after Penn Central's rail assets were conveyed to Conrail. While the EEOC charge names Penn Central dba Consolidated Rail Corporation in the caption and while it is conceivable that the EEOC investigation encompassed on-going acts of Conrail, the record on this point is unclear. The court therefore reserves ruling on whether claims under Title VII of any on-going racial discrimination on the part of Conrail are properly raised in this suit.

For the reasons stated, defendant Conrail's motion to dismiss is denied without prejudice to reconsideration of the successorship question when the record on that issue is adequately developed.

IT IS SO ORDERED.