HARLINGTON WOOD, Jr., Circuit Judge.
In this consolidated appeal, intervenor Railway Labor Executives’ Association (“RLEA”) presents three distinct but related issues concerning the implementation of labor protection conditions to be imposed in the Section 77 reorganization of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company (“Milwaukee”). These appeals involve the propriety of the reorganization court’s interpretation of the nature, extent, and timing of employee benefit payments required by Section 5 of the Milwaukee Railroad Restructuring Act (“MRRA”), Pub.L. No. 96-101, 45 U.S.C. § 901 et seq. (Supp. Ill 1979). We affirm.
I.
The first of the three major issues raised by RLEA concerns the adequacy of the level of labor protective conditions imposed upon the Milwaukee by the reorganization court.[1] RLEA argued below that the normal levels of protection — ninety days notice and final negotiation of an implementing agreement — were required by Section 5 of the MRRA. The special master and the reorganization court correctly rejected RLEA’s arguments. The modified Appendix B conditions (those adopted by the reorganization court) are as protective as statutorily required, are consistent with both the scheme and language of the MRRA, and are in accord with Interstate Commerce Commission (“ICC”) and judicial precedent.
The ICC has developed, over the years, a set of labor protective provisions to be imposed in the usual case of an abandonment, transfer, or sale. The provisions currently require carriers to give ninety days advance notice of an intended transaction and to negotiate an implementing agreement prior to the transaction’s consummation. See Oregon Short Line Railroad— Abandonment — Goshen, 360 I.C.C. 91 (1979) (“Oregon Short Line III”); New York Dock Railroad — Control—Brooklyn Eastern Dis *1152 trict Terminal, 360 I.C.C. 60 (1979) (“New York Dock II”). The ninety days notice and prior negotiation provisions represent the minimum levels of employee protection in the usual abandonment or 49 U.S.C. § 11343 proceeding.[2] Id.; Mendocino Coast Railway, Inc.-Lease and Operate-California Western Railroad, 360 I.C.C. 653, 654-56, 662 (1980), petition for review pending sub nom., RLEA v. I.C.C., D.C.Cir. Nos. 78-2157 and 80-1274 (“Mendocino”); Seaboard Coast Line Railroad Co.-Abandonment, 360 I.C.C. 257, 258 (1979). See 44 Fed.Reg. 28909 (May 17, 1979). The railroad is precluded from consummating the proposed transaction until such an agreement is effected. See Oregon Short Line III, supra, 360 I.C.C. at 91.
Under the scheme recommended by the special master and ultimately approved by the reorganization court, all affected Milwaukee employees are to be protected by the special master’s “Appendix B” conditions, which slightly modify the customary levels of protection. Appendix B allows the transaction to be completed after ten days notice even if the implementation agreement is not yet negotiated or finalized. However, Appendix B requires that any employee who is injured as a result of completion of a transaction before final negotiation of an implementing agreement must be made whole.
Under Sections 5(a)(1) and 5(b)(1) of the MRRA, 45 U.S.C. §§ 904(a)(1) and 904(b)(1) (Supp. Ill 1979), the reorganization court must also provide a fair arrangement at least as protective of the interests of employees as that required under 49 U.S.C. § 11347 (1976 and Supp. Ill 1979). Section 11347 requires the carrier to provide a fair arrangement at least as protective of the interests of employees as the terms imposed under Section 11347 prior to February 5, 1976 (the date the section was amended) as well as those established under Section 405 of the Rail Passenger Service Act of 1970 (“RPSA”), 45 U.S.C. § 565 (1976 and Supp. Ill 1979).
A.
RLEA argues here that the minimum levels apply in all abandonments including those which are the subject of these appeals. Accordingly, RLEA submits that if Section 11347 requires a notice and negotiation provision more protective of the employees’ interests than those allowed under Appendix B in order to comply with the requisite minimum levels, then the Appendix B conditions imposed by the reorganization court are defective under Section 5 of the MRRA. It follows, RLEA says, that the court could remove neither the ninety day nor the prior negotiation requirements in its attempt to tailor protection under Section 5(a)(1). Our task therefore is to ascertain the required levels of protection to which Congress was referring when it included, within the MRRA, reference to the provisions imposed under the predecessors to Section 11347 as well as under Section 405 of the RPSA.
RLEA avers that the decision in New York Dock Railway v. United States, 609 F.2d 83, 94-95 (2d Cir. 1979), supports its position that a ninety day notice period and final negotiation prior to consummation represent the requisite statutory minimum degree of protection contemplated by Section 11347. However, New York Dock was a normal case involving the transfer of control between two carriers. The Second Circuit there affirmed the ICC’s imposition of employee protective provisions which included the ninety day advance notice requirement and final negotiation of an implementation agreement prior to consummation. The case at bar is anything but normal.
As noted above, the ICC has often fashioned protective conditions designed to fit the unique circumstances of a particular case. The New York Dock court recognized this by stating: “[i]t is beyond challenge that within its discretion the ICC may fash *1153 ion employee protective conditions that are tailored to the special circumstances present in individual cases.” Id., 609 F.2d at 91-92. In other words, the statutory minimum levels are “[sjubject of course to any modifications shown to be needed because of the facts of a particular case.” Oregon Short Line III, supra, 360 I.C.C. at 97.
Contrary to RLEA’s assertions, the statutory minima necessary in the usual abandonment are not required in unusual instances as present here. The Milwaukee is a bankrupt carrier, in a crisis situation, and is subject to embargo orders. In such circumstances, the courts have modified the customary conditions. In total abandonment cases for small railroads, for example, no employee protection has been imposed under 49 U.S.C. § 10903(b)(2) (Supp. Ill 1979), which contains identical language requiring provisions for labor protection at least as beneficial as established under Section 11347. See Wellsville, Addison & Gale-ton Railroad Corp. — Abandonment, 354 I.C.C. 744 (1978). In cases approving track-age rights and leases under Section 11347, the ICC imposes a twenty day notice period and does not require prior final negotiation of an implementing agreement. See Mendocino, supra, 360 I.C.C. at 653; Norfolk and Western Railway Co. — Trackage Rights — Burlington Northern, Inc., 354 I.C.C. 605, 607 (1978).
The ICC, in two recent decisions, has also found alteration of the customary conditions to be proper. In Oregon Short Line IV, 360 I.C.C. 666, 674-75 (1980), the ICC found that imposition of Oregon Short Line III levels was not required to comply with the similar mandate of 49 U.S.C. § 10903 (Supp. Ill 1979) which contains identical language to Section 5(a)(1) of the MRRA. The ICC also upheld as adequate, under similar provisions contained in 5(b) of the MRRA, an employee protection agreement negotiated between the trustee, other carriers, and the Milwaukee’s unions which provided for only ten days notice and required no final negotiation. Burlington Northern Inc. Purchase (Portion) — Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 363 I.C.C. 298 (1980).
Section 405 of the RPSA, in addition, which required establishment of protective conditions no less than those found in Section 5(2)(f) (now codified in Section 11347) was held to neither mandate ninety days notice (twenty days notice was allowed) nor final negotiation of an implementing agreement. Congress of Railway Unions v. Hodgson, 326 F.Supp. 68 (D.D.C.1971). There, the court held that the shortened notice provision was equivalent to traditional ICC prescribed labor protection under the RPSA, and therefore rejected the contention that the failure to require the ninety day notice standard rendered the labor protection inadequate. The court also noted that the prescribed conditions fully protected employees from any adverse effect from consummation of related transactions prior to final negotiation of an implementing agreement, especially in light of a provision there which ensured that all affected employees would be made whole from any injury.
RLEA mistakenly contends that the 1976 amendment to Section 5(2)(f) (now codified at Section 11347) overruled Hodgson insofar as its interpretation of the Section is concerned. This is so, RLEA says, because to read Hodgson now as representing a valid expression of the minimum levels of protection required by Section 11347 would necessitate reading Congress’ subsequent reference to Section 5(2)(f) out of Section 11347. To the contrary, a review of the legislative history of the Section and an evaluation of the Congressional intent behind the Section’s amendment, indicates that Congress did not intend to elevate the aspects of any single ICC ruling to a statutory minimum protective level to be utilized in all transactions. If anything, the legislative history of the 1976 amendments to Section 5(2)(f) suggests Congressional ratification of and deference to past ICC practice of formulating individual protective conditions to fit the circumstances.[3]
*1154 B.
Our conclusion is also supported by reference to the statutory language and scheme of the MRRA, as well as by consideration of the practical impacts that imposition of the normal conditions would have upon the entire reorganization effort.
Two provisions within the MRRA are plainly contradictory to a ninety day notice provision. In Section 5(a)(1), the reorganization court is empowered to authorize the termination of service on a line to be abandoned during the period for appeal of the original abandonment order. The order authorizing such termination, in addition, may not be stayed. As the special master made clear: “Since Congress took affirmative steps to permit the cessation of service during an appeal period immediately following authorization of an abandonment, the suggestion that it also required labor protection which might delay cessation of service for [ninety] days is not logical.” S.A. at 50. Secondly, in Section 7 of the MRRA, 45 U.S.C. § 906 (Supp. Ill 1979), Congress provided subordinated loans to the Milwaukee for a sixty day period subsequent to the date the abandonments may first be authorized. The imposition of a ninety day notice requirement would be inconsistent with the Congressional determination to support continued operation of the non-core portions of the Milwaukee for only sixty days. Operations would cease and employees would be unemployed absent either ninety days notice or a final implementing agreement.
Moreover, a ninety day delay would be contrary to the reorganization scheme envisioned by the MRRA, because the trustee could not rapidly cease operation of unprofitable lines. The scheme contemplated the trustee’s ability to rapidly cease such unprofitable service. Imposition of a ninety day delay in service termination would eliminate that essential element and might very well defeat any reorganization whatsoever.
A ninety day notice requirement as well as a mandate for final negotiation are also impractical and would not benefit any party to the reorganization. Due to the embargo currently in effect, Milwaukee employees, if the two conditions are imposed as RLEA requests, would be without employment, pay, and most if not all the protective benefits under the MRRA. The entire reorganization effort might be impeded due to the delays, and the businesses and communities which would normally use the Milwaukee lines would be injured by the interruption of service.
We are also mindful that the primary purpose of the notice and negotiation requirements is to resolve the assignment and selection of employees by an acquiring carrier. A shorter time is necessary and logical, given that there may be no acquiring carrier in abandonments and therefore no assignment or employee selection is required.
C.
We note at this juncture that RLEA presents an apparently inconsistent argument that ninety days notice is not the level required prior to the Milwaukee abandonments. On the one hand, RLEA has argued that the ninety day period is the statutory minimum. On the other hand, RLEA avers here that there is a mandatory minimum level of protection which might be less than ninety days, but which ensures that the carrier’s actions are not unilateral in effect.[4] During the negotiation period, *1155 RLEA contends that the carrier should not be permitted to make unilateral changes in working conditions, including amendment of seniority rankings.
If RLEA is arguing that labor did not have the opportunity to negotiate with the trustee after the ten day period had elapsed and therefore the trustee had acted unilaterally, such an argument must fail for two reasons. First, the reorganization court is empowered to supervise the trustee’s actions to ensure complete compliance with the MRRA, other statutes, and pertinent ICC procedures. Thus, unilateral actions, if they do in fact arise, may be rectified by the reorganization court itself. Second and most importantly, is the protective condition which guarantees that any employee who suffers a loss in the absence of final negotiation of an implementing agreement will be “made whole.” RLEA assails the “make whole” provision as being unprotective of seniority rights, in that employee seniority rights will arguably be lost at a subsequent date in the absence of a final negotiated agreement. However, the “make whole” provision does have the approval of the reorganization court, which has retained jurisdiction to effect, inter alia, the respective labor guarantees. The court itself may resolve seniority disputes in the unlikely event that such problems do in fact occur.
D.
Since we find that the Milwaukee proceedings are anything but usual and that the normally imposed minimum protective levels are inapplicable, our inquiry must briefly turn to the issue of whether the ten day notice requirement with no prior negotiation is a fair and equitable arrangement at least as protective of the interests of employees under Section 11347.
The gravamen of RLEA’s argument is that the reorganization court lacked the discretion to deprive employees of the usual protection levels because the conditions imposed were allegedly less protective than those required under Section 11347. RLEA contends that any level of protection not precisely congruent to the conditions of Oregon Short Line III and New York Dock II provides less benefits than allowed under Section 11347.
The requirements, to the contrary, are not less protective, are fair and equitable, and represent a compromise array of labor protective conditions which are intended to enable the Milwaukee to reorganize while simultaneously protecting the interests of its employees, the trustee, and others. In the usual abandonment, the ninety day period serves, inter alia, to protect the employees by providing them with sufficient notice of pending displacement, reassignment, or dismissal. Shortening of the period is proper here, given that the nature of the abandonment transactions contemplated by the trustee have been a matter of public record for many months.
In addition, the circumstances in the Milwaukee reorganization do not permit the trustee to await final negotiation of an implementing agreement between the trustee and labor. RLEA properly submits that the primary purpose of an implementing agreement is to establish the seniority of employees of an abandoning railroad who are hired by the acquiring railroad (if one exists). RLEA has failed, however, to sufficiently detail how an employee would be prejudiced if an implementing agreement has not been finalized prior to consummation of the transaction. This failure is especially evident in view of the fact that the labor protection agreement must provide that any employee improperly displaced, dismissed, or reassigned prior to final negotiation of such an agreement be made whole for any losses suffered thereby. The effected provisions comprise an adequate alternative to requiring a final agreement, in view of Congress’ intent to expedite such transactions under MRRA Section 5(a). Labor is not precluded from reaching an *1156 agreement, if one becomes necessary, on any abandonment, sale, or transfer.
II.
RLEA also challenges the reorganization court’s determination that it was empowered to permit the trustee to defer payment of labor protection benefits pending final outcome of the reorganization proceedings.[5] At issue is the timing of the payment of the traditional Appendix B— Oregon Short Line III labor protective benefits. The special master and the reorganization court determined that payment of the benefits should properly be deferred pending completion of the Milwaukee reorganization. RLEA submits that the benefits must be made available to the employees as they accrue and therefore any payment deferral is improper as well as contrary to provisions within the MRRA. The considerations which follow dictate that the trustee’s payment of traditional labor protection benefits must await final consummation of the Milwaukee reorganization.
In the normal railroad abandonment or other transaction, the ICC conditions the termination upon payment of the traditional Oregon Short Line III — New York Dock II employee protective benefits which provide, inter alia, an election of either six years of guaranteed annual income or a lump sum separation allowance for sixteen and one-half months.[6] If these traditional conditions were imposed upon the Milwaukee abandonments necessary to reduce its operations to a manageable core, the benefits would total, as the record indicates, anywhere from $300 million to $1.2 billion, with the closest estimation of $350 million.[7] Report of the Special Master, Feb. 20, 1980 at 20, S.A. at 38. See 125 Cong.Rec. H10213 (Daily ed. Nov. 2,1979) (remarks of Rep. Madigan); 125 Cong.Rec. H9909, H9920 (Daily ed. Oct. 30, 1979) (remarks of Reps. Madigan and Hagedorn respectively). Such an obligation upon the Milwaukee estate, as both the record and related legislative history reveal, would preclude any possibility of reorganization whatsoever, for the estate could not generate the required funds to pay such a substantial sum. Id.
To alleviate this hardship upon the estate, while simultaneously attempting to provide the employees with a lesser level of protection which the estate could realistically absorb immediately, Congress in the MRRA adopted a compromise proposal similar to that suggested in the trustee’s reorganization plan.[8] Under the proposal, as adopted, each Milwaukee employee is given the option of accepting guaranteed prompt payment of reduced labor protection benefits in return for waiving his or her right to traditional ICG or contractual benefits. MRRA Section 13, 45 U.S.C. § 912 (Supp. Ill 1979). The option would be attractive, as the record shows, due to: the cashlessness of the Milwaukee estate, the unresolved issues concerning the priority and ultimate payment of traditional benefits,[9] and the subse *1157 quent resolution and prioritization of the rights of all creditors whose claims might be subject to suspension, deferral, or other modification in the interest of a successful reorganization.
MRRA Sections 9 and 15, 45 U.S.C. §§ 908, 914 (Supp. Ill 1979) require the trustee and labor to negotiate an optional protective arrangement whereby employees affected by the reorganization would be assured of some form of prompt and guaranteed monetary benefits. Federal financing of up to $75 million is provided to fund the payments. 45 U.S.C. § 914 (Supp. Ill 1979). The benefits, as implemented in the arrangement between the trustee and the Milwaukee’s labor unions, include, inter alia, a displacement allowance equal to eighty percent of an employee’s previous compensation for a three year period, or at the employee’s option, a dismissal allowance equal to $2,000 per year of service to the Milwaukee up to a maximum payment of $25,000.[10] S.A. at 40.
In proceedings before the special master, the trustee argued that payment of traditional Appendix B — Oregon Short Line III benefits be deferred and considered in a consummated plan along with the payment of other creditors. S.A. at 4. RLEA urged in the abandonments at issue that the Milwaukee be required to pay traditional benefits immediately. The special master recommended that the trustee be authorized to defer payment of traditional labor protection benefits under Appendix B. S.A. at 56, 127-28. The reorganization court adopted the report and recommendation of the master. Order Nos. 276-B, 307, 307A. This appeal followed.
A.
At the heart of our resolution of the deferral issue is the question of whether the imposition of traditional labor protection benefits, in lieu of the guaranteed benefits provided within the MRRA, is an expense of administration of the Milwaukee estate, and is therefore payable as the specific benefits accrue. The special master inferred and the reorganization court agreed that traditional benefit payments were not an expense of administration. S.A. at 45, 72-74. We agree and note that our holding that payment of traditional benefits here cannot be classifiable as an administrative expense is limited to instances where the facts are similar to those present here and where Congress has also addressed the issue (here under the MRRA).[11] In reaching this conclusion, we must reference appropriate canons and maxims of statutory construction and must also ascertain the intent of Congress in its enactment of the MRRA.[12]
We begin by construing provisions within the MRRA. As this court has observed, “the starting point in every case involving the construction of a statute is the language itself.” Canadian Imperial Bank of Commerce Trust Co. v. Fingland, 615 F.2d 465, 468 (7th Cir. 1980), citing International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). Section 9 of the MRRA, 45 U.S.C. § 908, provides that the benefits and allowances within the elective scheme “shall be treated as administrative expenses of the estate of the Milwaukee Railroad.” Therefore, these claims are immediately payable upon appropriate employee election. In addition, the MRRA is devoid of any mention of timing or deferral of traditional benefits and does not state whether traditional benefits are classifiable as administrative expenses.[13]
*1158 Our construction of the MRRA is guided in part by reference to the maxim of statutory construction — expressio unius est exelusio alterius — which means literally that the expression of one thing is the exclusion of the other. The maxim is not a rule of substantive law and is only one of statutory construction whose use is occasionally rejected.[14] Newberger v. Commissioner of Internal Revenue, 311 U.S. 83, 61 S.Ct. 97, 85 L.Ed. 58 (1940); United States v. Massachusetts Bay Transportation Authority, 614 F.2d 27, 28 (1st Cir. 1980); E.E. O.C. v. Kimberly-Clark Corp., 511 F.2d 1352, 1362 (6th Cir.), cert. denied, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975); 2A Sands, Sutherland on Statutory Construction, § 47.23, at 123 (4th ed. 1973). Application of this maxim indicates that Congress, upon passing the MRRA, did not intend to require traditional labor protection benefits to be treated as an administrative expense upon the Milwaukee estate.[15] See Martin v. Hamil, 608 F.2d 725, 728 (7th Cir. 1979). If Congress had so intended, such intention would have been clear from express reference within the MRRA itself.[16] Since Congress stated that the optional benefits are to be classified as an administrative expense, in the absence of a similar statement concerning traditional benefits, the benefits are not similarly classifiable. See Marshall v. Gibson’s Products, Inc. of Plano, 584 F.2d 668, 675 (5th Cir. 1978). Further, careful exclusion of a like provision for traditional benefits indicates that the exclusion was intentional. Thus, the provision should not be implied where excluded. Marshall v. Western Union Telegraph Co., 621 F.2d 1246, 1251 (3d Cir. 1980).
We find this to be a proper inference to draw from the MRRA. See Keaukaha-Panaewa Community Association v. Hawaiian Homes Commission, 588 F.2d 1216, 1223-24 (9th Cir. 1978), cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979). However, to ensure that nothing contradicts this inference, an examination of the MRRA legislative history and construction of the statute as a whole must be completed. Martin v. Hamil, supra, 608 F.2d at 728; Hill v. Whitlock Oil Services, Inc., 450 F.2d 170, 173, 14 A.L.R. Fed. 895 (10th Cir. 1971); Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States, 312 F.2d 214, 220 (1st Cir. 1963), aff’d, 377 U.S. 235, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964).
Pertinent legislative history of the MRRA is indicative that the Act was designed to “[ajssure a prompt and workable method for reorganizing the Railroad by . . . providing an affordable method of employee protection which will not totally erode all the assets of the Milwaukee estate.” 125 Cong.Rec. H10212 (Daily ed. Nov. 2, 1979) (remarks of Rep. Madigan). *1159 In structuring this method of protection, it is evident that Congress contemplated that payment of traditional benefits are not administrative expenses and therefore must be deferred.[17] Congressman Madigan, one of the MRRA House sponsors, when addressing the utility of the MRRA “option” provisions for labor protection, stated that “[s]ince traditional labor protection from the Milwaukee Railroad would be subject to lengthy litigation it is our belief that most employees would elect to receive the labor protection provided under [the MRRA].” 125 Cong.Rec. H9909 (Daily ed. Oct. 30, 1979) (emphasis added). This sentiment was echoed by Congressman Daschle: “Under this bill, employees who lose their jobs or are transferred elsewhere would receive immediate benefits, provided they forego other traditional labor benefits which are usually accompanied by litigation and years-long delays in receiving claims." Id., at H9915 (emphasis added). Congressman Marlenee said that the MRRA “[a]llows an employee to choose the option of receiving labor protection benefits quickly or waiting to receive traditional labor protection... . ” Id., at H9918.
Since traditional benefit payment must be deferred, it follows that Congress intended that they not be viewed as an administrative expense, as it is settled that under normal circumstances, payment of administrative expenses must occur as the expenses accrue and may not be deferred.
Construction of the MRRA as a whole also supports our conclusion. It is perhaps the oldest canon of statutory construction that a statute be interpreted with the overriding purpose of Congress kept firmly in mind. Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Co., 641 F.2d 482, 487 (7th Cir. 1981) (and the authorities cited therein); Atchison, Topeka, and Santa Fe Railway Co. v. United States, 617 F.2d 485, 490 (7th Cir. 1980). Here, Congress envisioned provision of employee benefits which would not totally erode the estate’s assets. RLEA’s interpretation would serve to negate this purpose, as immediate payment of traditional benefits would render the elective benefit provisions meaningless. No employee, when presented with the choice of eighty percent of his or her income for three years (under the MRRA elective scheme) or one hundred percent of his or her income for six years (under the traditionally imposed scheme) would select the lesser elective provisions.[18] Accordingly, the Milwaukee would be faced with a very large liability payable immediately, which would likely result in liquidation of the total estate.[19] Even though the levels with *1160 in the optional scheme were derived from agreement between labor and the trustee, Congress could not have intended that traditional benefits not be deferred.[20]
Moreover, acceptance of RLEA’s position would render the MRRA optional scheme a mere redundancy, in violation of another well-known principle of statutory construction that all provisions within a statute are to be interpreted as meaningful and are not to be considered as mere surplusage. National Federation of Federal Employees v. Brown, 481 F.Supp. 704, 708-09 (D.D.C. 1979) (and the citations therein), rev’d on other grounds, 645 F.2d 1017 (D.C.Cir.1981); Laufman v. Oakley Bldg. & Loan Co., 408 F.Supp. 489, 498 (S.D.Ohio 1976). It is axiomatic that the MRRA must be construed to prevent the optional scheme from being rendered inoperative or superfluous. Zeigler Coal Co. v. Kleppe, 175 U.S.App.D.C. 371, 536 F.2d 398, 406 (1976). See United States v. Menasche, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615 (1955).
Accordingly, we conclude that, under these facts and where Congress has so directed, traditional labor protection benefits are not classifiable as an expense of administration of the Milwaukee estate. Their payment must be deferred.
B.
Aside from reference to both well-settled rules of statutory construction and the legislative history of the MRRA, our resolution of two additional sub-issues — priority and ICC order compliance — compels us to conclude that the traditional benefit payment must be deferred.
First, payment deferral of traditional benefits is also required because the actual priority of such claims is unclear and cannot be fully ascertained until the reorganization plan is finalized. We have concluded thus far that the traditional protective benefits are not properly classifiable as administrative expenses currently payable. However, our conclusion does not settle the issue of the proper priority to be' accorded to the traditional benefits if and when they are ultimately paid. While the question of actual priority is not before us, and therefore need not be resolved in this appeal, analysis of the many considerations which will aid in its eventual determination is instructive as to our resolution of the issue of traditional benefit deferral.
RLEA argues that payment of traditional benefits must never be deferred and must be paid as incurred. RLEA bases its claim upon two sub-arguments: (1) that the benefits are expenses of administration — a view we have already rejected, and (2) that the traditional benefits are not deferrable and must be granted first priority since they are necessary: to preserve the estate, to satisfy the public interest, and to prevent a severe loss of employee morale; citing United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939), and In re Penn Central Transportation Co., 484 F.2d 1300, 1302 n.2 and n.3 (3d Cir. 1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). In essence, RLEA avers that the failure to provide traditional benefits as incurred amounts to a violative failure to provide meaningful employee protection. Therefore, the public interest demands that these payments not be deferred. We cannot agree.
The public interest, if anything, mandates benefit deferral under these facts, given that some attractive options are immediately available to Milwaukee employees and that deferral is needed, as the record reveals, to preserve any possibility of reorganization at a future date. See Matter of Chicago, Rock Island, and Pacific Railroad *1161 Co., 545 F.2d 1087, 1090-91 (7th Cir. 1976). The benefits are only to be deferred here, and in all likelihood will in fact be paid. We find the employees to be fairly and equitably treated under either scheme. See United States v. Lowden, supra, 308 U.S. at 238, 60 S.Ct. at 255. Further, both schemes, when viewed in combination, do provide meaningful employee protection. It is unreasonable to conclude that deferral will result in low employee morale, as we have been unable to locate any record evidence which would support such an argument.
RLEA incorrectly submits that the purpose behind traditional labor protection benefits is to mitigate the harsh consequences of reorganization at the time they are visited upon the employees. Since the consequences affect the employees immediately, RLEA contends that the traditional benefits should be made available when the consequences in fact arise. To the contrary, Congress recognized and resolved this problem by enacting the alternative benefit scheme and contemplated, as noted earlier, that traditional benefit payment must be deferred.
We turn briefly to the decisions which come the closest to resolving the deferral and priority issues. They involve the priority of severance payments in non-railroad reorganizations, with the payments either possessing a contractual foundation or being derived from past company practice. The cases turn on the issue of whether the severance payments are classifiable as a “cost and expense of administration” under Section 64(a)(1) of the Bankruptcy Act, 11 U.S.C. § 104(a)(1) (now repealed).[21] In cases where the severance payments vary in accordance with the length of an employee’s service (as do the traditional benefits here), three courts of appeals have considered the problem, reaching divergent results.[22] Two circuits have held that only that portion of a severance pay claim which is apportionable to employee service rendered after filing of the arrangement may be afforded cost of administration status under Section 64(a)(1). Accordingly, benefits related to employee service rendered before the filing are not payable as accrued. In re Mammoth Mart, Inc., 536 F.2d 950 (1st Cir. 1976); In re Public Ledger, Inc., 161 F.2d 762 (3d Cir. 1947). Another circuit, however, has held that the entire amount of the variable payments is entitled to first priority as an administrative expense. Straus-Duparquet, Inc. v. Local Union No. 3 International Brotherhood of Electrical Workers, 386 F.2d 649 (2d Cir. 1967).[23]
The former holdings are based upon the view that because the amount of severance *1162 pay depends upon the length of employment, the consideration supporting the employees’ claims was the service performed over the entire employment period. Thus, only that portion of the benefits directly attributable to the services performed for the trustee as the debtor-in-possession are entitled to priority. In re Mammoth Mart, Inc., supra, 536 F.2d at 954-55. The latter holding is grounded upon rationale which views severance pay as not being earned day to day. Rather, severance pay is considered to be compensation for employment termination, since the termination is incident to administration of the bankrupt’s estate. Straus-Duparquet, supra, 386 F.2d at 651; In re W. T. Grant Co., 620 F.2d 319, 321 (2d Cir.) (per curiam), cert. denied, 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980). It follows, said the court, that the full amount of the severance benefits are incident to the trustee’s continued operation of the business.[24]
We note that none of these decisions is strictly applicable to this appeal. Each involved bankruptcy proceedings to which Section 64 is made expressly applicable and where voluntary severance pay programs were in effect. They are not precedent for the treatment of an involuntary, statutorily imposed benefit program as is present here. Moreover, there is serious doubt as to whether Section 64 applies to reorganization proceedings under Section 77. Collier states that it is “extremely doubtful” that Section 64 is applicable. Collier also indicates, as the special master noted, S.A. at 28, that the principles derived in equity receiverships are controlling in priority resolution under Section 77. Collier, Bankruptcy, Vol. 5, f 77.21 at 608-09 (14th ed. 1978). See In re Penn Central Transportation Co., 520 F.2d 1388, 1391 (3d Cir. 1975).
These conflicting authorities, aside from their general inapplicability, do not resolve the priority question as it relates generally to the deferral issue. Accordingly, we decline to adopt either view a,t this juncture, and instead base our resolution upon other considerations. Deferral should be resolved while cognizant of both the need to conserve estate assets for reorganization and to ensure “fairness to all persons having claims against the insolvent.”[25] Reading Co. v. Brown, 391 U.S. 471, 477, 88 S.Ct. 1759, 1763, 20 L.Ed.2d 751 (1968). Neither Mammoth Mart, Public Ledger, nor Straus-Duparquet give adequate consideration to the fairness issue required by Reading, as each only prioritizes actions which benefit the trustee or which accrue as a result of the trustee’s administration of the respective estates. Here, fairness mandates, as the special master found, a consideration of: the ultimate fate of the Milwaukee, the total amount of benefits to be paid, the effect of the benefit claims upon the overall reorganization effort, and the impact that affording priority to the employee claims to traditional benefits will have upon other Milwaukee creditors. S.A. at 29-30.
*1163 Moreover, acceptance of RLEA’s position that traditional benefits are currently payable as accrued would result in the reorganization court placing in priority one set of claims against the estate over all other equally significant claims. This occurrence would result in subordination of other claims in favor of the employees’ claims. Such an unfair result simply cannot stand.
It is settled that the general theme of the Bankruptcy Act is “equality of distribution.” If one claimant is to be preferred over others, the purpose should appear from the pertinent statutes. Nathanson v. N.L.R.B., 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952); In re Mammoth Mart, Inc., supra, 536 F.2d at 953. Neither the Bankruptcy Act nor the MRRA require special treatment for traditional employee claims here. To prioritize these claims where they are not clearly entitled to such treatment, is not only inconsistent with the policy of equality of distribution but it also dilutes the value of the priority for the claims of creditors Congress in fact intended to prefer. In re Mammoth Mart, Inc., supra, 536 F.2d at 953. See Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 470-71 n.3, 94 S. Ct. 2504, 2506, 2507 n.3, 41 L.Ed.2d 243 (1974). Aside from being unfair, such an interpretation would also serve to undermine the values promoted within the MRRA and the Bankruptcy Act itself. In re Mammoth Mart, Inc., supra, 536 F.2d at 955.
The second factor which compels us to conclude that deferral is required concerns the relationship between the ICC and the reorganization court. RLEA argues that traditional benefits may not be deferred because a reorganization court is powerless to defer benefit payment if such payment has been effected pursuant to an ICC order under either 49 U.S.C. §§ 10903(b)(2) or 11347 (1976 and Supp. Ill 1979). In support, RLEA cites Matter of Chicago, Rock Island and Pacific Railroad Co., 537 F.2d 906 (7th Cir. 1976), cert. denied, 429 U.S. 1092, 97 S.Ct. 1102, 51 L.Ed.2d 537 (1977) and In re Lehigh Valley Railroad Co., 508 F.2d 332 (3d Cir. 1975). These cases address the balance of authority between the ICC and the reorganization court related to certain transactions (interline accounts) between the bankrupt and other carriers.
Both cases indicate that the reorganization court is powerless to exempt a bankrupt railroad from compliance with ICC orders. Rock Island, supra, 537 F.2d at 910; Lehigh Valley, supra, 508 F.2d at 338. Neither case, however, involved labor protection and both predated the MRRA. RLEA contends that employee protective conditions which the ICC imposes under Sections 10903 or 11347 represent an integral portion of any ICC abandonment authorization and accordingly a Section 77 reorganization court is without authority to vary the terms of such ICC orders. RLEA mistakenly says that since the ICC requires labor benefit payment pursuant to its abandonment orders, the reorganization court in these abandonments violated the terms of the orders by deferring traditional benefit payment.
RLEA’s argument is off-track for several reasons. First, Congress has indicated, in enacting the MRRA, that the ICC’s authority over Milwaukee abandonments is merely advisory. Authority over these abandonments is clearly vested with the reorganization court. MRRA Section 5(a), 45 U.S.C. § 904(a). Hence, Congress itself has preempted normal ICC orders, and therefore the ICC orders here cannot possibly possess the controlling effect urged by RLEA. Upon preemption, there remain simply no ICC orders to be exempted from, see Matter of Penn Central Transportation Co., 553 F.2d 12, 15-16 (3d Cir. 1977), and no specific order directed to this reorganization trustee has been violated, see Matter of Boston and Maine Corp., 600 F.2d 307, 312-13 (1st Cir. 1979).
Second, both cases cited by RLEA pertain to ICC orders concerning ongoing operations of the trustee as part of the operation of a railroad in reorganization. Rock Island, supra, 537 F.2d at 910-11; Lehigh Valley, supra, 508 F.2d at 333, 338. The ICC orders at issue in the cases were related to comprehensive and mandatorily imposed ICC regulation of all aspects of set *1164 tlement of per diem interline accounts, which were properly considered as an integral portion of the respective railroad operations.[26] Id. The matter before us — employee labor protection — is not classifiable as a segment of operation of the Milwaukee by the trustee and is not governed here by ICC orders concerning railroad operation.[27] In addition, we are hard-pressed to envision payment of traditional benefits as a segment of actual Milwaukee operation when no benefits whatsoever may be owing in the event of total liquidation of the Milwaukee estate.[28]
C.
In any event, it is well settled that the reorganization court possesses broad discretionary authority to postpone the satisfaction of valid claims upon the estate’s assets, including those having priority, where postponement is required to ensure that the Section 77 railroad reorganization will be completed. Section 77(a), 11 U.S.C. § 205(a) (repealed 1978).[29] This authority is derived in part from Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Railroad Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935) (“Continental Illinois”).[30] There, the Supreme Court relied upon the need for preservation of the estate’s assets for use in reorganization in upholding the issuance of an injunction which prohibited a secured creditor from selling collateral in its possession; given that the sale would so hinder, obstruct, or delay the preparation and eventual consummation of a reorganization plan and might possibly prevent plan finalization altogether. Id., at 676-77, 55 S.Ct. at 606-607. The Court said, 294 U.S. at 676, 55 S.Ct. at 606:
[A reorganization] proceeding under § 77 is not an ordinary proceeding in bankruptcy. It is a special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised. And to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the Section, and thereby to render its provisions futile.
This court has cited Continental Illinois with approval in In re Brown, 84 F.2d 433, 436 (7th Cir. 1936). There, we affirmed entry of an injunction aimed at prevention of sale of stock pledged as collateral.
This broad discretionary power has evolved to afford the reorganization court the authority to defer both pre- and post-petition claim payment.[31] Continental Illinois, supra, 294 U.S. at 676-77, 55 S.Ct. at 606-607. See, e. g., Thompson v. Texas Mexican Railroad Co., 328 U.S. 134, 143-44, *1165 66 S.Ct. 937, 943, 944, 90 L.Ed. 1132 (1946) (enforcement of contractual provisions of the debtor deferred pending ICC review); Matter of Boston and Maine Corp., 600 F.2d 307, 308-10 (1st Cir. 1979) (deferral of prereorganization freight car per diem charges); Matter of Lehigh Valley Railroad Co., 458 F.2d 1041, 1045 (3d Cir. 1972) (payment of lien on debtor’s property deferred); In re Penn Central Transportation Co., 452 F.2d 1107, 1108-09 (3d Cir. 1971), cert. denied, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972) (payment of taxes accruing during the reorganization were deferred). In addition, the Third Circuit has even gone so far as to adopt a “rule of necessity” which allows for the immediate payment of some administrative expenses while others are deferred.[32] See Matter of Reading Co., 439 F.Supp. 389, 391 (E.D.Pa.1977), aff'd without opinion, 633 F.2d 211 (3d Cir. 1980), cert. denied,-U.S.-, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981); Matter of Penn Central Transportation Co., 400 F.Supp. 920, 926 (E.D.Pa.1975).
Underlying the discretionary authority of the reorganization court is recognition of the object of the Bankruptcy Act’s provisions of eventual completion of the reorganization effort. Toward this end, the court is required to maintain the status quo of the debtor pending plan consummation. Continental Illinois, supra, 294 U.S. at 679, 55 S.Ct. at 605-607; Matter of Stanndco Developers, Inc., 534 F.2d 1050, 1052 (2d Cir. 1976). See Penn Central Transportation Co. v. Irving Trust Co., 594 F.2d 952, 957 (3d Cir. 1979). The court may, in addition, ensure plan finalization by deferring claim satisfaction as a “virtual court of equity.” Continental Illinois, supra, 294 U.S. at 675-76, 55 S.Ct. at 605-606; In re Penn Central Transportation Co., 484 F.2d 1300, 1305-06 (3d Cir. 1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).
Recognizing the discretionary authority to defer payment of traditional protective benefits, our inquiry turns to whether that discretion was abused. See Matter of Chicago, Rock Island and Pacific Railroad Co., 545 F.2d 1087, 1090-91 (7th Cir. 1976); In re West Counties Construction Co., 182 F.2d 409, 411 (7th Cir. 1950). As the Supreme Court in Continental Illinois noted, 294 U.S. at 677, 55 S.Ct. at 606:
[a] claim [by a creditor] that injurious consequences will result .. . may not, of course, be disregarded by the district court; but it represents a question addressed not to the power of the court, but to its discretion — a matter not subject to interference of an appellate court unless improvidently exercised.
Accord, New Haven Inclusion Cases, 399 U.S. 392, 491-92, 90 S.Ct. 2054, 2109-2110, 26 L.Ed.2d 691 (1970); Matter of Ranchero Motor Inn, Inc., 527 F.2d 1044, 1047 (9th Cir. 1975); In re Diplomat Electric, Inc., 499 F.2d 342, 346, 34 A.L.R. Fed. 568 (5th Cir. 1974).
RLEA avers that the reorganization court abused its discretion by permitting deferral in the absence of instituting methodology to guarantee that the court will periodically review and monitor whether *1166 deferral, in whole or in part, must be continued. This argument must fail, in that the record evinces a keen awareness by the court of its continuing duty to reassess the progress of the Milwaukee reorganization and to order the trustee to pay traditional benefits at the earliest feasible date. We remain confident that the court will ably discharge this obligation.
RLEA also states that the abandonments involved in these appeals affect few Milwaukee employees with the total monetary impact being significantly lower than the estimated sum. In addition, RLEA contends that some benefits — those which will not severely drain the estate’s assets— should be currently payable and not deferred. Therefore, RLEA implies that the monies payable to the affected employees should be immediately due and that a failure to order prompt payment amounts to an abuse of discretion by the reorganization court. This reasoning is misplaced, in that the reorganization court is powerless, absent special circumstances not present here, to cause the claims of one group of creditors to be singled out to receive special priority of payment. We recognize that it would be very unlikely that immediate benefit payment in any single set of abandonments or other transactions would preclude reorganization. However, in light of fairness considerations detailed earlier, the reorganization court must prevent the opening of a pandora’s box of inequities in terms of selecting which set of abandonments or transactions merit early payment, which individual types of benefits (relocation expenses, displacement allowances, health or welfare benefits) can be paid currently and which must be deferred. The court must also protect those employees in transactions to be completed at a later date, when the Milwaukee estate’s assets may have been seriously depleted by prior “accelerated” payment of both Section 9 and contractual benefits. Any premature benefit payment would also serve to render the optional protective scheme within the MRRA meaningless. Therefore, no set of abandonments or transactions may be scrutinized in isolation.
Were we to accept RLEA’s argument, we could envision a mass of litigation concerning the many present and future Milwaukee transactions each requesting an early determination of the respective labor protection issues, with requests for both accelerated payments and piecemeal judicial inquiries of the efficacy of the individual benefits for each set of transactions. In order to prevent such an onslaught, in all fairness to all creditors and employees, and in light of the public interest considerations presented, traditional employee protective benefits must be paid simultaneously if and when the reorganization is completed.
III.
The final issue raised by RLEA concerns the propriety of the reorganization court’s refusal to impose both labor protective conditions and terms of Milwaukee collective bargaining agreements upon non-carrier purchasers of previously abandoned Milwaukee lines. RLEA argues that although the purchasers are merely prospective carriers, they must provide former Milwaukee employees with full labor protection under MRRA Section 5(b)(1). The court, RLEA says, was required to provide an arrangement to protect the Milwaukee employees from the overall impact of the entire transaction — abandonment and acquisition, and not simply from the abandonment segment. In other words, RLEA submits that employee protection and existing collective bargaining obligations should be the responsibility of the new purchasers, rather than of the Milwaukee estate. The reorganization court, to the contrary, characterized the transactions in issue as abandonments followed by subsequent acquisitions by entities which had never operated as carriers. Therefore, the court found the provisions within MRRA Section 5(a)(1) to be applicable and accordingly, the new purchasers were bound by neither labor protective provisions nor existing collective bargaining agreements normally imposed upon the Milwaukee itself.
Our reference, among other things, to MRRA legislative history, to language *1167 within the MRRA, and to current ICC and related decisional precedents mandates affirmance. Under these facts, the reorganization court correctly imposed protective labor conditions and the provisions within the collective bargaining agreements upon the Milwaukee estate alone, and acted properly in its refusal to impose such conditions upon the non-carrier purchasers.
A.
As background, we must briefly detail the statutory scheme and related ICC and reorganization court actions which resulted in this appeal. Section 5(a) of the MRRA empowers the reorganization court to authorize abandonment of Milwaukee rail lines pursuant to 11 U.S.C. § 1170 (Supp. Ill 1979). The court may also authorize service termination on lines to be abandoned, pending expiration of the time for appealing an abandonment order or the final determination of any such appeal. Section 5(a), 45 U.S.C. § 904(a). The court, in addition, is empowered to permit the sale or transfer of Milwaukee lines “to be used in continued rail operations,” subject to ICC approval within the time limits fixed by the court, not to exceed 180 days. Sections 5(b)(1) and 5(bX2), 45 U.S.C. §§ 904(b)(1) and 904(b)(2). Under either scheme, the reorganization court must impose upon the parties appropriate labor protective conditions to ensure protection in behalf of all employees adversely affected by the respective abandonment, sales, or other transactions. Sections 5(a)(1) and 5(b)(1). Under either section, the court must determine that employees are protected in accordance with provisions contained within 49 U.S.C. § 11347.
Pursuant to MRRA Section 5(a)(1), the reorganization court on February 29, 1980 granted the trustee’s motion for authority to abandon and subsequently to sell the Milwaukee’s non-core Metaline Falls and Port Angeles branch lines, the former being acquired by the Port of Pend Oreille (“Port”)[33] and the latter by the Seattle and North Coast Railroad Company (“SNC”).[34] Order Nos. 297, 297A. The Port and the SNC were non-carrier entities who intended to either apply for ICC operating authority (in the case of SNC), or to contract with newly formed operators who would themselves apply for ICC operating authority (in the case of the Port.)[35]
By Order Nos. 281A and 281B, dated February 19, 1980 and March 10, 1980 respectively, the reorganization court authorized abandonment of certain Milwaukee lines with corresponding acquisition by the State of Wisconsin of several lines within its boundaries. The ICC, in response to a separately filed Wisconsin application, also approved the Wisconsin line acquisitions.[36]
The Wisconsin acquisitions, as the record indicates, were effected in order to secure ownership of certain Milwaukee properties after cessation of its service.[37] The ICC noted that Wisconsin did not propose to operate over any of the acquired land or track and concluded that service over the lines would not, in all likelihood, continue absent State acquisition.[38] In fact, the Wisconsin legislature envisioned that the State would merely own the lines. Actual operation over the lines by local municipalities, counties, or their selected operators would *1168 only occur upon individual application and related ICC approval.
RLEA requested, pursuant to MRRA Section 5(b), that the reorganization court impose upon the prospective non-carrier purchasers the following conditions: (1) negotiation with Milwaukee employee representatives for the reassignment of the work force; (2) employment of those employees so selected subject to Milwaukee rates of pay, rules and working conditions; and (3) responsibility for the payment of all employee Appendix B protective claims.[39] The reorganization court, in authorizing the abandonments and acquisitions at bar, rejected RLEA’s motion and reasoning that Section 5(b) mandated imposition of statutory and contractual labor protective conditions upon the prospective non-carrier purchasers instead of upon the Milwaukee estate. The court’s rejection was grounded upon cognizance that sales to non-carriers for rail use had been traditionally treated as abandonments followed by subsequent ICC application for operating authority, with the entire labor protection expense imposed solely upon the abandoning carrier. Collective bargaining agreements also were not to be imposed upon the new non-carrier purchasers. Order Nos. 297, 281C.[40] The court, in reaching its decision, viewed the transactions as abandonments and subsequent acquisitions by non-carriers which either would obtain operating authority directly (the SNC), might seek to arrange for third parties to obtain ICC operating authority (the Port), or would do nothing to aid its operators in obtaining ICC authority (Wisconsin).
It is clear that MRRA Section 5(a) applies to court-approved abandonments of Milwaukee lines. It is clear that Section 5(b) is applicable to the sale or transfer of Milwaukee lines to be used in continued rail operations, subject to ICC approval. Section 5(b)(2), in addition, permits a “purchasing carrier” of a line to be used in continued operations to operate interim service as a common carrier over Milwaukee lines. At issue therefore, is which provision is directly applicable where a Milwaukee line abandonment is followed by acquisition by a non-carrier entity. Neither subsection specifically mentions abandonments followed by acquisitions by non-carriers who intend to operate, to arrange for eventual operation, or to serve as the liaison to the trustee and the ICC. The trustee and intervenors-appellees contend that Section 5(a) should govern this statutory void. RLEA, on the other hand, avers that the abandonments and acquisitions should be effected pursuant to Section 5(b), thus imposing labor protection obligations and Milwaukee collective bargaining provisions upon the purchasers. We hold that such abandonments and related acquisitions were properly completed under Section 5(a). Accordingly, labor protection benefits were correctly imposed on the Milwaukee estate alone and the non-carriers were not subject to the terms of Milwaukee collective bargaining agreements.
B.
We first address the propriety of the reorganization court’s imposition of protective conditions upon the trustee rather than upon the acquiring non-carriers. MRRA Section 5(c), 45 U.S.C. § 904(c) states that “[n]othing in this section shall be deemed to affect the priorities or timing of payment of employee protection which might have existed in the absence of this chapter.”[41] *1169 Accordingly, our task is to ascertain which party, under existing law aside from MRRA, is to bear the expense of labor protection upon the occurrence of line abandonment and subsequent acquisition by a non-carrier.[42]
Under the Interstate Commerce Act, Pub.L. No. 95-473, 49 U.S.C. § 10101 et seq. (Supp. Ill 1979), a distinction is made between non-carrier acquisitions and other purchase transactions which involve two or more existing rail carriers. Such non-carrier acquisitions and the operating authority which follows and which results from abandonment or other line extension is now governed by 49 U.S.C. §§ 10901 and 10903, formerly Section 1(18)-1(20), 49 U.S.C. §§ 1(18)-1(20) (repealed 1978).[43] Transactions involving transfers or sales between two or more existing carriers, normally termed unifications, are governed by 49 U.S.C. § 11343, formerly Section 5(2), 49 U.S.C. § 5(2) (repealed 1978).[44] People ex rel. Illinois v. United States, 604 F.2d 519, 524-25 (7th Cir. 1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980) (and the cases cited therein); North Western Employees Transportation Corp. — Purchase, 342 I.C.C. 58, 65 (1972).[45] Section 10901 applies to the new acquisitions by non-carriers regardless of whether or not a corresponding line abandonment application has been filed by the existing operating carrier or has been denied. People ex rel. Illinois v. United States, supra, 604 F.2d at 524. This is so, because this Section and its predecessor are essentially directed at the transportation-oriented activities of a single rail carrier or non-carrier applicant, whereas the focus in Section 11343 proceedings is upon the potential effect of multi-carrier transactions. Id., 604 F.2d at 525-26. See Okmulgee Northern Railroad Co. — Abandonment, 320 I.C.C. 637, 639-40 (1964).
Therefore, under prior law, when a non-carrier acquires a line of another carrier— either subsequent to an abandonment or otherwise, the transaction is completed under 49 U.S.C. § 10901. Under this section, responsibility for labor protective benefit payments rests, if at all, with the vendor/abandoning carrier and is not imposed in the absence of circumstances not present here,[46] upon the acquiring non-carrier.[47] As *1170 the ICC recently stated in the proceeding to approve the SNC acquisition and operation of the Port Angeles line:
We find it unnecessary to determine whether section 5(b) as opposed to section 5(a) of the MRRA should apply to this proceeding. We believe that even were the application brought pursuant to section 5(b) that we would not be required to impose labor protection conditions upon S&NC. The imposition of labor protection in a transaction proposed under 49 U.S.C. § 10901 is discretionary. In numerous proceedings in which a non-carrier sought to acquire and operate a line of railroad not previously abandoned, the Commission has determined that 49 U.S.C. § 10901, rather than 49 U.S.C. § 11343 (which carries mandatory labor protection), applies. When finding employee protection appropriate in a proceeding under 49 U.S.C. § 10901, the Commission has usually imposed it on (or required that its costs be borne by) the selling rail carrier and not the non-carrier purchaser.
Seattle & North Coast Railroad Co. — Acquisition and Operation, Finance Docket No. 29158F, July 22, 1980, at 10.
Moreover, when an abandonment application has been granted or previously dismissed upon a procedural ground,[48] employee protection has consistently been imposed solely upon the abandoning carrier, whether or not a later acquisition followed.[49] People ex rel. Illinois v. United States, supra, 604 F.2d at 525, 526-28 (and the citations therein). Sales and transfers of lines to existing carriers are alternatively treated as unifications, and employee protection responsibility may be allocated to both carriers. 49 U.S.C. §§ 11343-11350.
ICC imposition of benefit payments upon the abandoning carrier alone, in non-carrier acquisitions of abandoned lines, is grounded upon the desire to address the adverse consequences incurred by the carrier’s employees which are a direct result of the abandonment. It is the carrier’s cessation of operations, not the non-carrier vendee’s acquisition which adversely affects the employees. Seattle & North Coast Railroad Co. — Acquisition and Operation, Finance Docket No. 29158F, July 22, 1980, at 10 (“SNC — Acquisition and Operation”). Here, the abandoning carrier itself reaps the significant benefit in the form of savings realized by the discontinuance of uneconomic and cumbersome rail service, and is *1171 therefore the primary beneficiary when relieved of its duty and costs of operation. Id. See I.C.C. v. RLEA, supra, 315 U.S. at 373, 62 S.Ct. at 717. No related benefit is discernable which flows to the acquiring non-carriers as a result of the Milwaukee abandonments at issue. Therefore, there is no justification in imposing such a cumbersome and potentially devastating burden upon them. Tennessee Central Railway Co. —Abandonment, supra, 334 I.C.C. at 245-46.
In addition, we are mindful that placing responsibility for benefit payments upon the abandoning carrier alone in instances where the line is eventually acquired by a non-carrier advances the need for continued rail service over the line. This imposition protects as well as assists th.e new operators of these new business enterprises in their efforts to make a going business over lines which have previously been operationally uneconomical.[50] Wisconsin — Acquisition, supra note 36, at 2; Common Carrier, supra, 363 I.C.C. at 136; Okmulgee Northern Railway Co. — Abandonment, supra, 320 I.C.C. at 639. The burden upon the new operator, upon commencement of line operation, will be great enough without the additional costs of labor protection. See Durango and Silverton Narrow Ga.uge Railroad Co. — Acquisition and Operation, 363 I.C.C. 292 (1979).
Since it is evident that the acquisitions by the Port, SNC and Wisconsin respectively are preceded by Milwaukee abandonments, the above-detailed policies are especially applicable here. Thus, in the absence of the MRRA, the obligation for benefit payment would rest solely upon the Milwaukee estate. It follows therefore, that since the MRRA itself mandates that nothing within the Act affect traditional priorities or timing of payment of employee protection, the estate is obliged for total benefit payment.
This conclusion is also supported by reference to the specific language within the MRRA. First, Section 5(a), as mentioned, mandates the reorganization court when authorizing any abandonment, to require the carrier to bear total labor protection responsibility. If the Milwaukee transactions are in fact classifiable as abandonments, then Section 5(a) and not Section 5(b) is applicable. It is well settled that line abandonment by a rail carrier is effected by a voluntary permanent or indefinite cessation or discontinuance of line operations. Smith v. Hoboken Railroad, Warehouse & Steamship Connecting Co., 328 U.S. 123, 130, 66 S.Ct. 947, 951, 90 L.Ed. 1123 (1946); Matter of New York, Susquehanna & Western Railroad Co., supra, 504 F.Supp. at 856 (and the cases cited therein)(finding the analogue of Section 5(a) — MRRA Section 17(a), 45 U.S.C. § 915(a), applicable to the abandonment at issue there); Matter of Valuation Proceedings Under §§ 303(c) and 306 of the Regional Rail Reorganization Act, 439 F.Supp. 1351, 1370 (Special Rail Reorganization Court 1977) (Friendly, J.). Thus, in the context of these transactions, it is clear that the Section 5(a) abandonment procedure is in effect and not that utilized for a sale or transfer. See Matter of New York, Susquehanna & Western Railroad Co., supra, 504 F.Supp. at 856. Here, as the reorganization court found, employees will be severed from their jobs with the same benefits as accorded to employees on lines where service is completely terminated.
Second, Section 5(b)(3) permits “the purchasing carrier” to operate interim service as a common carrier pending final ICC review, and also permits preliminary line sale or transfer to “another rail carrier.” Further, MRRA Section 4, 45 U.S.C. § 903 (Supp. Ill 1979), provides for sales by the trustee to “another rail carrier or any other person ...” (emphasis added). Yet Con *1172 gress was careful under Section 5(b)(3) only to permit another rail carrier to operate interim service. If Congress had desired non-carriers to operate interim service, it could have so indicated. In the absence of such an expression, we interpret Section 5(b) as applicable only to existing carriers, and thus inapplicable to non-carriers.[51] Hence, the acquisitions at issue here may not be completed utilizing Section 5(b).[52]
To the contrary, RLEA argues that Section 5(b) governs any and all sales of former Milwaukee lines to be used in continued rail operations and accordingly, all labor protection must be imposed on the acquiring non-carrier. Here, RLEA submits that Congress sought to change existing law to except Milwaukee abandonments and acquisitions from the normal procedures by distinguishing between “abandonments” and “sales and transfers.” Congress, RLEA says, intended that purchases by non-carriers of abandoned Milwaukee lines be subject to the same conditions usually reserved for unification transactions. In support, RLEA avers that Section 5(b) applies to these acquisitions because it permits the court to: (1) expedite the final transfer of abandoned lines by imposing a time limit for ICC review; (2) expedite review of any ICC provision by providing for limited judicial review; and (3) permit the court to allow acquiring carriers to operate interim service over the line pending final ICC action. Thus, RLEA contends that since Congress established an expedited method to be utilized in sales of lines, this procedure must be employed in each of the transactions at bar. We cannot agree.
Examination of the effect of Section 5 upon Section 77(o) of the Bankruptcy Act, 11 U.S.C. § 205(o) (repealed 1978), as well as reference to the MRRA itself and to the previously detailed maxims of statutory construction compels us to conclude that RLEA’s argument is without merit. RLEA, in addition, is unable to cite any relevant statutory or decisional authority for its position. We begin by noting that RLEA admits that acceptance of its argument concerning the scope and impact of Section 5(b) would “extensively modify” existing law. This position simply cannot stand and is violative of the “status quo” mandates which clearly constrain our interpretation of the reach of Section 5(b).[53] Further, it is fundamental error and is contrary to decisional precedent to determine, as RLEA would have us do, that Section 5(a) is rendered irrelevant when an abandonment is followed by a sale to a non-carrier. The argument misreads Section 5(a) as imposing responsibility for the conditions upon the abandoning carrier only in the absence of a subsequent sale. However, Section 5(a) mandates imposition upon the abandoning carrier regardless of whether any subsequent sale or transfer is effected.[54]
*1173 In any event, Section 5(b) is not as efficacious as RLEA would have us believe. Section 5(b) only requires the reorganization court to “provide a fair arrangement” consistent with the requisite protective levels under 49 U.S.C. § 11347. In no instance, therefore would Section 5(b) automatically extend responsibility for protective conditions to the non-carrier purchasers. Even if Section 5(b) were applicable, the court is empowered to, and realistically could limit the responsibility to the Milwaukee estate alone. At best, the “fair arrangement” appeals to the reasoned discretion of the reorganization court in effecting the diverse Congressional objectives expressed within the MRRA.
Furthermore, RLEA’s interpretation would defeat the intent and purpose of Congress in facilitating the Milwaukee reorganization and would frustrate the primary objectives sought to be advanced within the MRRA.[55] These objectives include expeditious and successful reorganization of the Milwaukee, preservation of essential rail service to the maximum extent possible, and avoidance of potential unemployment as well as damage to the regional and national economy. MRRA Section 2(b), 45 U.S.C. § 901(b) (Supp. Ill 1979). The record indicates that if RLEA is correct in its view of Section 5(b)’s applicability, the acquisitions at bar would not have occurred, as the states and other acquiring non-carrier entities would be required to divert scarce investment and start-up funds to finance employee benefits, wage rates, and other conditions without regard to the extent the conditions are mandated by existing market conditions. If the acquiring entities are burdened with these requirements, future rail service over many of the lines, as the record reveals, would be rendered wholly unfeasible.
These new entities must be permitted to tailor service to the respective demands of both shippers and passengers, and this goal is only achievable without imposition of the responsibility for the protective obligations. It is extremely doubtful whether any new operator would commence operations, absent significant state, local, or federal subsidization, if it would be required to operate subject to the identical labor benefits and conditions imposed upon the Milwaukee. The newly formed short line carriers, as the record reveals, simply cannot afford to assume similar responsibilities for labor protection as can a national carrier like the Milwaukee.
C.
We now turn to the question of the propriety of the reorganization court’s refusal to impose terms of Milwaukee collective bargaining agreements — including wage rates, rules, and working conditions upon the acquiring non-carriers or their respective operators. RLEA urges that former Milwaukee employees are entitled to carry with them their entire collective bargaining rights and agreements, if and when they commence employment with the new operating carriers. We find an absence of perti *1174 nent statutory language or decisional authority which would mandate such a result. Thus, we hold that the provisions within the agreements need not be imposed upon the acquiring non-carriers or their operators as the former Milwaukee employees secure new employment with them.
We begin by noting the nearly unanimous rule of traditional federal labor law, that absent a near identity of employers and perfect continuity of a single enterprise, a court may not impose the substantive provisions of a collective bargaining agreement between a union and the predecessor employer upon a nonconsenting successor employer. Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, 417 U.S. 249, 264-65, 94 S.Ct. 2236, 2244-2245, 41 L.Ed.2d 46 (1974); Golden State Bottling Co., Inc. v. N.L.R.B., 414 U.S. 168, 181-85, 94 S.Ct. 414, 423-425, 38 L.Ed.2d 388 (1973); N.L.R.B. v. Burns International Security Services, Inc., 406 U.S. 272, 283-84, 92 S.Ct. 1571, 1580 (1972); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Bartenders and Culinary Workers Union, Local 340 v. Howard Johnson Co., 535 F.2d 1160, 1162 (9th Cir. 1976) (and the cases and authorities cited therein).
Reference to the particular facts of each acquisition at issue[56] in view of the totality of the circumstances,[57] compels us to conclude that non-carriers and the next operators are not successor employers within the context of the federal labor law. Neither the required degree of employer identity[58] nor the substantial continuity of the business operation[59] are present here. Thus, the terms of the Milwaukee collective bargaining agreements may not be imposed upon these parties who have either expressly or impliedly declined to voluntarily assume the obligations contained within the agreements.[60]
RLEA argues that these labor cases are inapplicable and of no effect in these appeals because the cases at bar arise under the Railway Labor Act. We cannot agree. It is the policies enunciated in these decisions which guide us in resolution of this *1175 issue of first impression.[61] These policies include those stressed by the Burns Court: (1) freedom of contract under federal labor law (as Burns had not agreed to assume its predecessor’s obligations); (2) inhibition of the free flow of capital if the new employers were to be bound to pre-existing agreements; and (3) freedom of the successor to effect substantial alterations in the operation of the enterprise. N.L.R.B. v. Burns International Security Services, Inc., supra, 406 U.S. at 280, 287-88, 92 S.Ct. at 1578, 1582. As the Court stated, 406 U.S. at 287-88, 92 S.Ct. at 1582:
[H]olding either the union or the new employer bound to the substantive terms of an old collective bargaining contract may result in serious inequities. A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital. On the other hand, a union may have made concessions to a small or failing employer that it would be unwilling to make for a large or economically successful firm. The congressional policy manifest in the [National Labor Relations] Act is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities. Strife is bound to occur if the concessions that must be honored do not correspond to the relative economic strength of the parties.
We recognize that Congress has occasionally evinced a desire to bind new operators to existing bargaining agreements of their employees. See, e. g., Regional Rail Reorganization Act of 1973, Pub.L.No. 93 — 236, as amended, 45 U.S.C. §§ 772(b), 774 (1976 and Supp. Ill 1979) (Conrail and United States Railway Association bound by prior agreements); Rail Passenger Service Act of 1970, Pub.L.No. 91-518, as amended, 45 U.S.C. § 565 (1976 and Supp. Ill 1979) (Amtrak and the National Railroad Passenger Corp. also bound); Urban Mass Transportation Act of 1964, Pub.L.No. 88-365, 49 U.S.C. § 1609(c) (1976 and Supp. Ill 1979) (privately employed employees transferred to state governmental employment, in circumstances not present here, were protected). These acts indicate that where Congress desires successor employers to undertake bargaining obligations of predecessor employers, the intent is explicit and is clearly evident from the pertinent statute itself. Here, evidence of a similar desire is totally lacking within the MRRA or other pertinent statutes. Such a desire may not reasonably be implied, contrary to the assertions of RLEA.[62]
*1176 IV.
For the foregoing reasons,[63] the orders of the reorganization court are Affirmed. Costs to the Trustee.

. This issue is addressed in appeal Nos. 80-1347 and 80-1545. For background on the Milwaukee reorganization, see In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 611 F.2d 662 (7th Cir. 1979).

. For a history of the evolution of these conditions see generally Oregon Short Line III, supra, 360 I.C.C. at 91, and New York Dock Railway v. United States, 609 F.2d 83 (2d Cir. 1979).

. The legislative history is silent as to the Congressional intent in amending Section 5(2)(f). However, the Joint Explanatory Statement of the Conference Committee stated that Section *1154 10903(b)(2) of Title 49, which contained identical language to amended Section 5(2)(f):
[Required employee protection no less beneficial than that established under section 5(2)(f) of the Interstate Commerce Act and section 405 of the [RPSA] but without the intention to change the policy and practice of the Commission in connection with certificates involving total termination of service by a railroad company.
S.Rep.No.94-595, 94th Cong., 2d Sess. 218, reprinted in [1976] U.S.Code Cong. & Ad.News 233.

. The fact that RLEA now appears to suggest that the ninety day period may not be required (Tr. at 56, Special Master Proceedings Jan. 16, 1980), gives further support to our conclusion *1155 that the usual statutory minimum protective levels are inapplicable in this reorganization. Since RLEA concedes this, they must also concede that this proceeding is not the usual proceeding or merger where ninety days and no less would be required.

. This issue is addressed in appeal Nos. 80-1347 and 80-1545.

. Also included are provisions concerning fringe benefits, displacement allowances, and moving expenses.

. RLEA incorrectly avers that the trustee has failed to prove that the immediate payment of the benefits would approach $350 million. Reference to both the legislative history, infra, and to the record itself, exhibit that this estimate is reasonable and quite realistic. S.A. at 38. The estimate, in addition, represents the expense of the total of all Milwaukee transactions, not only those involved in these appeals. It is this overall impact which Congress sought to alleviate through enactment of the MRRA.

. The proposal for the settlement of labor benefit payment appears in Sections 8 through 15 of the MRRA, 45 U.S.C. §§ 907-914 (Supp. Ill 1979) .

. In the event of Milwaukee liquidation, employees might not receive any labor benefits whatsoever. See RLEA v. Gibbons, 448 U.S. 1301-05, 100 S.Ct. 2668, 2671, 65 L.Ed.2d 1094 (Stevens, Circuit Justice 1980), stay denied per curiam, 448 U.S. 909, 100 S.Ct. 3057, 65 L.Ed.2d 1140 (1980), cert. granted,-U.S. -, 101 S.Ct. 2014, 68 L.Ed.2d 322 (1981); Matter of New York, Susquehanna & Western Railroad Co., 504 F.Supp. 851, 859-63 (D.N.J. 1980) . See also North Hampton & Bath Railroad Co.-Abandonment, 354 I.C.C. 784 (1978). While this issue need not be resolved in this appeal, the uncertainty which it presents is one *1157 factor which an employee would certainly consider in benefit selection.

. Other benefits include moving expenses, partial reimbursement for educational expenses, and preferential employment rights on other railroads.

. Accordingly, we make no ruling upon whether payment of traditional benefits in all other railroad transactions is properly viewed as an administrative expense.

. Discussion of related decisional law appears in Section IIB of this opinion, infra.

. RLEA erroneously contends that MRRA Section 5(c), which provides “Nothing in this section shall be deemed to affect the priorities or timing of payment of employee protection *1158 which might have existed in the absence of this chapter,” mandates that traditional benefits be paid immediately. This is so, RLEA urges, for two reasons. RLEA first says that MRRA Section 5(a) requires imposition of a protective arrangement at least as protective of the interests of employees as detailed under Section 11347. However, neither the traditional benefits nor the provisions within Section 11347 address the timing or priority of payments in a reorganization. They concern only the amount of the payments. Timing or priority are properly left to the reasoned discretion of the reorganization court. Second, RLEA states that under prior law, the payment of traditional benefits are in all instances administrative expenses. Since we find that under these facts and where Congress in the MRRA so provides that the benefits are not administrative expenses, this argument must fail.

. For cases rejecting the maxim for reasons not pertinent here, see Tri-State Terminals, Inc. v. Jesse, 596 F.2d 752, 755 n.2 (7th Cir. 1979); National Petroleum Refiners Ass’n v. F.T.C., 157 U.S.App.D.C. 83, 482 F.2d 672 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). See also Radin, Statutory Interpretation, 43 Harv.L.Rev. 863 (1930).

. We note that it is generally for Congress to enumerate which items of expense connected with or growing out of the operation of the Milwaukee are to have priority in reorganization proceedings. See Central Hanover Bank & Trust Co. v. Williams, 95 F.2d 210, 212 (8th Cir. 1938).

. Had Congress intended to require traditional benefits to be treated as an administrative expense, it appears unlikely that it would have manifested such intent indirectly. Matter of Central Railroad of New Jersey, 579 F.2d 804, 816 (3d Cir. 1978).

. We also note that we have failed to locate and RLEA has failed to cite any language within the MRRA legislative history which directly or even indirectly indicates that Congress intended traditional benefit payments to be currently payable as an administrative expense.

. Here, RLEA attempts to distinguish the two benefit schemes as being so different and respectively attractive that a significant number of employees would opt for the lesser optional payments if both choices were simultaneously available. They argue that the seniority, separation allowances and other provisions are dissimilar enough to render each scheme uniquely desirable. To the contrary, the record indicates that the schemes are in effect indistinguishable. Therefore, it is unreasonable to expect employees to opt for a lesser benefit package when a more attractive full package is also available.
It is clear that Congress envisioned that any optional scheme within the MRRA would contain lower protective levels than those traditionally imposed. Thus, the essential inquiry here is not the comparison between the exact details of the two schemes, as the MRRA itself contains no mention of specific benefit provisions. Our task is to interpret the MRRA to ascertain the intent of Congress in order to determine if Congress could have contemplated that the elective scheme would be available at the same time of the superior traditional benefit scheme.
We are also mindful of a cardinal rule of statutory construction which effects a presumption against interpreting a statute in a manner which would render the statutory scheme ineffective or inefficient, or which would cause grave public injury. Aluminum Co. of America v. Dep’t of Treasury of the State of Michigan, 522 F.2d 1120, 1126-27 (6th Cir. 1975). RLEA has not overcome this presumption and has failed to prove that any employee would opt for any clearly less desirable benefit scheme.

. See discussion corresponding to notes 7 and 8, supra.

. We reach this conclusion while cognizant of our duty to favor an interpretation which would render the statutory design of the MRRA effective in terms of the Congressional policies behind its enactment and “[t]o avoid an interpretation which would make such policies more difficult of fulfillment, particularly where . . . that interpretation is consistent with the plain language of the statute [to be construed].” Motor and Equipment Manufacturers Ass’n, Inc. v. E.P.A., 201 U.S.App.D.C. 109, 627 F.2d 1095, 1108 (1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980), quoting National Petroleum Refiners Ass’n v. F.T.C., supra, 482 F.2d at 689.

. Section 64(a)(1) of the Bankruptcy Act provides in part as follows:
The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition. .. .
We also note that since this reorganization was filed prior to October 1, 1979, the applicable law is the old Bankruptcy Act and not the new Bankruptcy Code. See Bankruptcy Reform Act of 1978, § 403, Pub.L.No. 95-598, 92 Stat. 2683 (Nov. 6, 1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

. In cases where the trustee has assumed an employment contract which provides that all discharged employees are entitled to their salaries as severance pay for a brief time period subsequent to discharge, the payments are viewed as administrative expenses replete with Section 64(a)(1) priority. In re Public Ledger, 161 F.2d 762, 770-73 (3d Cir. 1947). See In re Mammoth Mart, Inc., 536 F.2d 950, 953 (1st Cir. 1976) (and the cases cited therein); Matter of Schatz Federal Bearings Co., Inc., 5 B.R.W. 549 (S.D.N.Y.Bkrtcy 1980). See also Matter of Central Railroad Co. of New Jersey, 579 F.2d 804, 815-17 (3d Cir. 1978).
Here, there is no similar employment contract and it cannot be said that the severance payments are wholly earned and accrued solely due to the trustee’s management. Thus, these cases are not controlling. See In re Public Ledger, supra, 161 F.2d at 771, 773.

. This decision was recently reaffirmed by the Second Circuit in In re W. T. Grant Co., 620 F.2d 319 (per curiam), cert. denied, 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980), where the court declined to overrule Straus-Duparquet based upon an argument that the Mammoth Mart court refused to accept its earlier reasoning in Straus-Duparquet. See Matter of Unishops, Inc., 553 F.2d 305, 308 (2d Cir. 1977).

. The First Circuit in Mammoth Mart rejected the Straus-Duparquet reasoning as unpersuasive, 536 F.2d at 955 (citations omitted):
It is established that a debt is not entitled to priority as a cost and expense of administration simply because the claimants’ right to payment arises after the debtor-in-possession has taken some action.... It is only when the debtor-in-possession’s actions themselves — that is, considered apart from any obligation of the debtor — give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration. When the debtor-in-possession commits a tort, ... or accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority. Here the .. . severance pay that the debtor-in-possession paid appellants fully compensated them for the services performed after the petition was filed. The claims for additional severance pay are based entirely upon services performed by appellants to the debt- or and, as such, are not entitled to priority.
In our case, it is hard to imagine that payment of traditional benefits renders any benefit to the trustee or has any relation to the preservation, development, or distribution of the assets of the Milwaukee estate, especially in light of the optional benefit scheme within the MRRA.

. Under the Bankruptcy Act itself, even where provision is made for priority classification of certain creditors (secured creditors for example), no timetable is established for the eventual payment of such claims. Matter of Penn Central Transportation Co., 553 F.2d 12, 16 (3d Cir. 1977).

. Thus, the reorganization court was correct in limiting the Rock Island decision to its special circumstances. Order No. 276B at 3-4, S.A. at 73-74.

. While, we recognize the broad ICC authority over general operations of the nation’s railroads, when issues unique to reorganization are involved which mandate discretion, flexibility and fairness be available to the reorganization court, primacy must be accorded to that court’s determinations, absent reasons to the contrary not present here. Matter of Penn Central Transportation Co., supra, 553 F.2d at 16.

. See note 9, supra.

. See note 21, supra.

. RLEA attempts to distinguish Continental Illinois by contending that claims for traditional benefits are not prereorganization claims and therefore the citation is inapplicable. To its, this distinction must be derailed. We read Continental Illinois and its progeny as vesting the reorganization court with broad discretionary authority to act to ensure eventual consummation of a viable reorganization plan. Accordingly, it is irrelevant whether the claim arose either pre- or post-reorganization, as even post-reorganization claims are properly deferred in certain instances. See In re Penn Central Transportation Co., 452 F.2d 1107 (3d Cir. 1971), cert. denied, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972). In fact, RLEA explicitly acknowledges this power of the reorganization court. Brief for Appellant RLEA, at 61-62.

. This power has been recognized by the Milwaukee reorganization court elsewhere in this proceeding. The record indicates that other claims have been deferred including, inter alia: payments of principal and interest on fixed and funded debt; with certain exceptiqns, the enforcement of judgments, liens, and setoffs of obligations; payment of retroactive wage increases and post-petition vacation pay; and payment of state and local taxes.

. There, the court stated:
... Since they accrued during reorganization the taxes here at issue are administrative expenses entitled ultimately to share pro rata with all claims within the first priority classification under section 64 of the Act, 11 U.S.C. § 104. Pro rata participation, however, does not necessarily imply that all claims are entitled to simultaneous participation. To so hold would unduly impair the flexibility so essential to a reorganization proceeding.
After due inquiry the district court concluded in effect that immediate payment of the property taxes in question would probably defeat the reorganization. It therefore decided that under the circumstances the only viable recourse was to postpone such payment for a reasonable time, taking into consideration the competing public interests inherent in reorganizing the railroad and in maintaining the revenues of the various taxing entities affected by the injunction.... Under these circumstances we conclude that section 77 did authorize the reorganization court to enjoin temporarily the payment or collection of the assessed property taxes.
In re Penn Central Transportation Co., supra, 452 F.2d at 1108-09 (citations omitted). See also Matter of Central Railroad Co. of New Jersey, 579 F.2d 804, 807 (3d Cir. 1978).

. The Port is a special district established by local referendum which is empowered to acquire rail lines for local service.

. The SNC proposed to render rail service over a portion of the previously embargoed lines between Port Angeles and Port Townsend, Washington.

. The Port has subsequently leased the line to the Pend Oreille Valley Railroad (“POV”). The POV, after ICC approval, currently renders service over the line pursuant to an operating agreement with the Port.

. State of Wisconsin — Acquisition of Certain Lines of Chicago, Milwaukee, St. Paul and Pacific Railroad Co., Finance Docket No. 29237, Jan. 30, 1980, Feb. 28, 1980, modified, Aug. 4, 1980 (‘‘Wisconsin — Acquisition ”).

. The State itself was empowered to acquire the properties due to a grant from the Wisconsin legislature. 1977 Wis.Laws, ch. 29, § 1343, creating Wis.Stat. § 195.199, later renumbered by 1979 Wis.Laws, ch. 34, § 1018, as Wis.Stat. § 85.09.

. Wisconsin — Acquisition, supra, note 36.

. The Port, POV, SNC, and Wisconsin were permitted to intervene before the reorganization court in support of the trustee’s opposition to RLEA’s motion.

. Order No. 297 concerns acquisitions by the Port and the SNC and is the subject of appeal No. 80-1348. Order No. 281C relates to the Wisconsin acquisitions and is the subject of appeal No. 80-1546. The Port, POV, SNC, and Wisconsin are all intervening appellees in these appeals. The State of South Dakota is also an intervening appellee herein. South Dakota is currently implementing a program similar to the rail service continuation program effected by Wisconsin.

. The Conference Report concerning Section 5 is in complete accord:
The Conferees intend that the granting of authority to the Bankruptcy Court to order sales and abandonments not change existing *1169 law with respect to employee protection. The employees’ right to protection shall be required by the Court to the same extent that it would have been provided by Interstate Commerce Commission under Section 11347 of the Interstate Commerce Act.
H.R.Conf.Rep.No.96-583, 96th Cong., 1st Sess. 17, reprinted in [1979] U.S.Code Cong. & Ad. News 1749.

. We address RLEA’s argument concerning imposition of collective bargaining agreements on non-carriers in Section IIIB of this opinion, infra.

. Section 10903 concerns the abandonment of the line while Section 10901 is related to the later acquisition or operation of the line. See Matter of New York, Susquehanna & Western Railroad Co., 504 F.Supp. 851 (D.N.J.1980).

. Examples of unifications include railroad mergers and consolidations.

. See Common Carrier Status of States, State Agencies and Instrumentalities, and Political Subdivisions, 363 I.C.C. 132 (1980) ("Common Carrier’’); Tennessee Central Railway Co.— Abandonment, 334 I.C.C. 235, 245^16 (1969).

. Two of the decisions cited by RLEA for the proposition that an acquiring non-carrier is expressly required to pay labor protective benefits are inapposite. In State of Oklahoma ex rel. Dep’t of Highways — Abandonment, 324 I.C.C. 666 (1965), the ICC exercised its discretion by imposing the payments upon the acquiring non-carrier — the State. This was effected where the State itself sought the line abandonment of the carrier, preliminary to eminent domain proceedings. The ICC also noted that since the acquisition was not accomplished as “the usual case of a railroad seeking to rid itself of a deficient branch operation [accordingly,] it would be unfair to place the burden of such protection on the [abandoning carrier].” Id., at 679. As the State and its citizenry were the principal beneficiaries, it was only reasonable that the expense of labor protection be borne by the State. Id.
In Central Railroad Co. of New Jersey— Abandonment, 342 I.C.C. 227, 301-02 (1972), the acquiring carrier of a line of a railroad in reorganization was required to comply with only certain minor obligations including hiring preferences and the preservation of seniority rights. The clear bulk of all major benefits were, in keeping with longstanding tradition, imposed upon the abandoning carrier. Thus, this decision cannot be interpreted as requiring an acquiring non-carrier to undertake the majority if not all of the labor protective obligations.

. RLEA, at this juncture, makes much of the issue of ICC discretion to impose benefit payment upon either the abandoning carrier or upon the new carrier in the event of unification. Under Section 11343, et seq., imposition of labor benefit obligations is mandatory, while under Sections 10901 and 10903 (and their predecessors), prior to 1976, imposition had been discretionary with the ICC. I.C.C. v. RLEA, 315 U.S. 373, 380, 62 S.Ct. 717, 721, 86 L.Ed. 904 (1942); People ex rel. Illinois v. United States, supra, 604 F.2d at 528-29; Okmulgee Northern Railway Co.-Abandonment, supra, 320 I.C.C. at 645. See Matter of New York, Susquehanna & Western Railroad Co., supra, 504 F.Supp. at 856-62. The issue of whether imposition is now mandatory as RLEA argues, subsequent to the 1976 amendment to the predecessor to Section 10903 by the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, § 802, need not be decided here.
RLEA implies that unless the acquiring non-carriers are responsible for benefit payment, the requirements of 49 U.S.C. § 11347 will not be met, as benefit imposition will otherwise be “meaningless” if imposed upon the abandoning carrier. As we determined earlier in Part I of this opinion, supra, the benefits which have in fact been imposed upon the Milwaukee alone, are at least as protective of the interests of the employees as those required under Section 11347. Thus, the requirements of both Sections 5(a) and 5(b) are satisfied in this regard. We note that the trustee has explicitly stated that the estate, in the absence of a total liquidation, will be responsible for the complete array of benefit payment determined by the reorganization court to be owing.
Therefore, the discretion issue is a red herring, as the required Section 11347 benefit levels will in fact be paid, regardless of the ICC’s discretion to mandate their payment.

. See Cadillac & Lake City Railway Co. — Acquisition and Operation, 320 I.C.C. 716, 718-20 (1964).

. In fact, in both types of non-unification transactions before us — abandonments and abandonments followed by acquisitions, the ICC has, in most circumstances, imposed responsibility for protective conditions upon the abandoning carrier.

. As the ICC has stated:
[I]n order to maintain a favorable revenue-to-cost ratio, the expenses of these new carriers must be kept to a minimum. Thus, if we were to establish a general policy of imposing conditions on all new operators, new enterprises would be discouraged from starting up. The result would be even more railroad employees out of work.
Wisconsin — Acquisition, supra, note 36, at 2. Accord, SNC — Acquisition and Operation, supra, at 11; Tennessee Central Railway Co.— Abandonment, supra, 334 I.C.C. at 246.

. In reaching this conclusion, we are especially mindful of the maxims of statutory construction which we utilized earlier and which are of equal use and import here. See discussion corresponding to notes 12-20, supra.

. Accordingly, we reject RLEA’s argument that the terms within Section 5(b)(3) serve only to limit the reach of the interim authority and preliminary approval provisions of Section 5(b)(3) itself. This narrow construction is violative, inter alia, of our duty to interpret a statute both consistently with its other provisions and so as to render each section completely effective. See notes 18 and 20, supra.

. It would be surprising for Congress to restructure such a long-standing practice in so subtle a fashion, as a new statute will not be read as even partially modifying a prior statute in the absence of a positive repugnancy between the new provisions and those of the old. Regional Rail Reorganization Cases, 419 U.S. 102, 133-34, 95 S.Ct. 335, 353-354, 42 L.Ed.2d 320 (1974). Given our interpretation of the respective provisions, we are hard pressed to find any repugnancy whatsoever.

. As the reorganization court noted, Order No. 297 at 4-5:
Sections 5(a) and 5(b) of the M.R.R.A. were obviously intended to govern two different types of transactions. Section 5(a) applies to a simple abandonment “pursuant to § 1170 of Title 11,” and § 5(b) applies to the “sale or transfer of a line of the Milwaukee Railroad to be used in continued rail operations, subject to the approval of the Commission...” Section 5(a) must be taken to apply to sales to any non-carrier, since the bankrupt railroad does not simply abandon its abandonments.

. RLEA’s interpretation is also inconsistent with several other provisions within the MRRA. As we determined in Part II above, traditional benefit payment must be deferred until a later date and is payable, if at all, as a claim upon the estate. We additionally noted that the optional benefit scheme requires guaranteed prompt payments which are currently owing as an administrative expense imposed upon the Milwaukee estate. We are hard-pressed to comprehend, given these two holdings, how benefit payment could possibly be imposed upon a non-carrier or its operator. Imposition of traditional benefit payment upon the new operators, upon completion of the reorganization effort, which might not occur for some time now, would work a severe hardship on the new operators; one which Congress could not have intended.
Moreover, prompt accelerated payment under the optional scheme could not be achieved, as the payments would not commence until the new carrier requested initial ICC acquisition and operating authority. Here, we envision a Milwaukee line abandonment with immediate benefit imposition upon the estate and six months later a non-carrier seeking line acquisition. If the obligations were imposed upon the new carrier or operator, either thé optional benefit payment would not have been promptly completed, or the traditional benefits would be paid at a later date and out of funds not originally contemplated for such a purpose.

. Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, supra, 417 U.S. at 262, 264, 94 S.Ct. at 2243, 2244; Shaffer v. Mitchell Transport, Inc., 635 F.2d 261, 266 and n.10 (3d Cir. 1980). See Local 115 Joint Board Nursing Home and Hospital Employees, Florida Division v. B & K Investments, Inc., 436 F.Supp. 1203, 1208-09 (S.D.Fla.1977).

. International Union of Electrical, Radio and Machine Workers, AFL-CIO-CLC v. N.L.R.B., 604 F.2d 689, 694 (D.C.Cir.1979).

. The record evidence demonstrates that the Milwaukee and the Port, POV, SNC, and Wisconsin are entirely separate entities, and these new carriers or their operators have selected their own work forces.

. Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, supra, 417 U.S. at 258-59, 94 S.Ct. at 2241-2242. See John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at 551, 84 S.Ct. at 915; Saks & Co. v. N.L.R.B., 634 F.2d 681, 687 (2d Cir. 1980); Zim’s Foodliner, Inc. v. N.L.R.B., 495 F.2d 1131, 1140-11 (7th Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974).
It is hard to imagine a clearer instance of a lack of substantial continuity of business operations than is present here. The Milwaukee — a large national carrier — has abandoned specific non-core lines. Some of these lines were acquired under specific ICC and reorganization procedures which call for local line operation by small local carriers whose primary purpose is the preservation of as much of the service to local shippers and passengers as is practicable. The required continuity is lacking where there has been an abandonment, a hiatus of operation, and only then a commencement of operation by a new carrier who initially acquired the line as a non-carrier entity. In other words, the rail operations are totally altered after the transfer of ownership. In addition, there is no substantial continuity of the work force here, as the record reveals that a low percentage of the former Milwaukee employees are employed with the new operators.

. Application of the many diverse factors utilized by courts to ascertain continuity of employer identity in the business enterprises does not alter our conclusion. See N.L.R.B. v. Tricor Products, Inc., 636 F.2d 266, 269-71 (10th Cir. 1980); Service Hospital, Nursing Home and Public Employees Union Local 47 v. Cleveland Tower Hotel, Inc., 606 F.2d 684, 687-88 (6th Cir. 1979); E.E.O.C. v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1094 (6th Cir. 1974) (and the cases cited therein).

. Other circuits have also reviewed these cases and have been guided by the policies there in expansion of their impact into areas beyond the confines of traditional labor law. See, e. g., E.E.O.C. v. MacMillan Bloedel Containers, Inc., supra, 503 F.2d at 1086 (where the court ruled that a corporate successor may be held liable for unfair employment practices of a predecessor corporation); Howard v. Penn Central Transportation Co., 87 F.R.D. 342 (N.D. Ohio 1980) (where the court found that a successor company could not be held liable for monetary relief arising out of alleged employment discrimination by a reorganized railroad company).

. There is no legislative history on point. However, Section 122 of the Rock Island Transition and Employee Assistance Act, Pub.L. No. 96-254, 45 U.S.C. § 1017 (Supp. Ill 1979), which, inter alia, grants the ICC authority to permit voluntary carrier use of the tracks and facilities of the Milwaukee contains relevant history:
“The conferees wish to make clear that paragraph (b) [which mandates that Milwaukee employees be used during the pendency of the temporary operating approval] is not intended to change existing Commission policy nor to require newly formed carriers to assume collective bargaining obligations or union representation.”
H.R.Rep.No. 96-1041, 96th Cong., 2d Sess. 34, reprinted in, [1980] U.S.Code Cong. & Ad.News 1195.

. Matters not expressly discussed herein have nevertheless been duly considered and have been determined to be meritless.