### In re ARMORFLITE PRECISION, INC., Debtor.

**Bankruptcy No. 282–00151.**

United States Bankruptcy Court,
D. Maine.

Aug. 24, 1984.

Daniel Amory, Portland, Me., trustee.

Stanley Greenberg, Portland, Me., for Equilease Corp.

## MEMORANDUM DECISION

FREDERICK A. JOHNSON, Bankruptcy Judge.

The trustee objected to a request for payment of administrative expenses filed on October 31, 1983, by Equilease Corporation a company with which the debtor had previously engaged in a tangled business relationship. After hearing, the court concludes that Equilease is entitled to only a

minimal amount of its claim as an administrative expense.

On September 5, 1980, Equilease Corporation leased two large machine lathes to Armorflite Southeast, Inc. ("Southeast"), a Florida corporation located in Cocoa, Florida. Soon after the execution of the five (5) year leases, which included pre-paid purchase options, the lathes were transferred to Kennebunk, Maine, to the premises of Armorflite Precision, Inc. ("Armorflite Maine" or "the debtor"), a separate Maine corporation. Equilease did not accede to this transfer. In September 1980 Equilease filed financing statements in both Maine and Florida to perfect its interest in the leases of the two lathes, which remained in Maine until September 1983. Armorflite Southeast was named as the debtor on both financing statements.

From the beginning, the payment history on the leases was checkered. Frequently Equilease assessed late charges against Armorflite Southeast. In August 1981 Equilease began proceedings to replevy the equipment. On August 13, 1981, as part of a settlement agreement, the president of Armorflite Southeast executed personal guarantees of the two leases. In addition, Southeast made a substantial payment on each lease. Within a few months, payments on the leases were again delinquent. The last payment on each lease occurred on January 15, 1982.

Armorflite Southeast complicated Equilease's difficulties by filing a chapter 11 petition in early 1982 in Florida. On April 8, 1982, Armorflite (Maine), also filed a chapter 11 petition in Maine. In the Florida case, Equilease obtained relief from the automatic stay imposed by section 362(a) of the Code, 11 U.S.C.A. § 362(a)(1979). Equilease also instructed counsel in Maine to seek relief from the stay because it knew or learned in the Florida proceedings that the equipment leased by Southeast might be in Maine in the possession of Armorflite (Maine). On June 9, 1982, Equilease brought a complaint for relief from stay against Armorflite (Maine) in this court. About two months later, the vice president

of Armorflite (Maine) informed Equilease that Armorflite (Maine) wished to retain the two lathes in Maine, and he proposed that his company undertake payment on the Southeast leases. To protect itself, Equilease demanded both a formal assumption agreement and the personal guarantee of the president of Armorflite (Maine). Scheduled for execution in September 1982, the assumption and guarantee were never executed. Nor did Armorflite (Maine) make any lease payments.

Armorflite (Maine) converted its case to a chapter 7 liquidation on June 3, 1983. A short time later, the trustee and counsel for Equilease negotiated the repossession of the two lathes, which the trustee conceded were not property of the estate. The parties set a pick up date of Friday, August 26. However, as that date approached, the trustee and counsel for Equilease agreed, without waiver of the trustee's objection to Equilease's claim, that the repossession would be delayed for one week. For the week's use of the equipment, the trustee paid $500 as a cost of administration. Repossession was scheduled for Tuesday, September 6. When the rigger from Equilease arrived at Armorflite (Maine)'s shop on September 6, employees forbad repossession of the lathes until the following day. The disassembling began at midday September 7 and was completed about twenty-four hours later. As a consequence of the repossession, this court dismissed the relief from stay proceeding on Equilease's motion in December 1983.

In October 1983 Equilease filed a request for payment of administrative expenses, claiming $51,000 as a chapter 11 administrative expense and $12,070 as a chapter 7 administrative expense. The chapter 7 claim includes a request for payment of $2070 which Equilease reimbursed its rigger to lay over in Maine for eighteen (18) hours during the repossession. Otherwise, the requested amounts are calculated from the monthly lease payments on the Southeast leases. Armorflite (Maine) admits to having used both lathes during the pendan-

cy of its chapter 11 and chapter 7 cases, although one of the lathes was inoperable for about two months of the chapter 11 reorganization and for all but a short time after the conversion to chapter 7.

The bankruptcy code provides for the payment of certain costs of administering the estate. Section 503 as relevant reads:

> (b) After notice and a hearing, there shall be allowed, administrative expenses ... including—
>> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]

11 U.S.C.A. § 503(b)(1979). Equilease contends that because the debtor possessed the lathes after filing, the trustee should pay to Equilease as administrative expenses the total of the scheduled monthly installments on the Armorflite Southeast leases for the period between the date of Armorflite (Maine)'s petition and the date the lathes were repossessed, as well as the layover costs of the rigger. The court must determine whether there is statutory authority for such payment.

■ Administrative expense payment is conceptually a kind of priority afforded to those who either help preserve and administer the estate, 11 U.S.C.A. §§ 503(b)(1)(A) and 507(a)(1), or who assist with rehabilitation of the debtor so that all creditors will benefit. *See In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984), *citing Reading Co. v. Brown*, 391 U.S. 471, 475, 88 S.Ct. 1759, 1761, 20 L.Ed.2d 751 (1968) (construing the predecessor to section 503).

The cost of these administrative services has priority of payment over the claims of many pre-petition creditors. In the case of a reorganization:

> [t]he policies underlying the provisions of § 503 (and its predecessor, § 64(a)(1) of the Bankruptcy Act, 11 U.S.C. § 104(a)(1) (1976) are not hard to discern. If a reorganization is to succeed, creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to

enable the bankrupt to function. *See In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976) (Coffin, Chief Judge). Thus, "[w]hen third parties are *induced* to supply goods or services to the debtor-in-possession ... the purposes of [§ 503] plainly require that their claims be afforded priority." *Id.* (emphasis added; footnote omitted). Without a provision like § 503, efforts to reorganize would be hampered by the necessity of advance payment for all goods and services supplied to the estate since presumably no creditor would willingly assume the status of a non-priority creditor to a debtor undergoing reorganization.

> This involves no injustice to the pre-petition creditors because it is for their benefit that reorganization is attempted. If reorganization successfully rehabilitates the debtor, presumably the pre-petition creditors will be better off than in a liquidation. *See Reading Co. v. Brown, supra*, 391 U.S. at 478, 88 S.Ct. at 1763. However, because priority should not be afforded unless it is founded on a clear statutory purpose, if the appellants' claim does not comport with the language and underlying purposes of § 503, their claim must fail. *See In re Chicago, Milwaukee, St. Paul & Pacific Railroad*, 658 F.2d 1149, 1163 (7th Cir.1981) —(general rule is equality of distribution; deviation must appear in the statute), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). Any preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress. *Id. In re Mammoth Mart, supra*, 536 F.2d at 953.

*In re Jartran, Inc.*, 732 F.2d at 586.

■ Because the special treatment involved in administrative payment should be allowed only when justified by the statute, the First Circuit in *Mammoth Mart* created a two part test to assess the appropriateness of administrative payment for the supply of goods and services. This court is guided by that test. First, the "debt must arise from a transaction with the debtor-in-

possession." That transaction might consist of supplying goods or services either pursuant to a contract with the debtor or pursuant to a previously existing contract which the debtor has assumed or failed to reject. In any event, there must be inducement by the debtor. Second, the goods or services supplied to the debtor after the petition must benefit the estate. *Mammoth Mart*, 536 F.2d at 954; *see also*, 11 U.S.C.A. § 503(b)(1979). Both criteria must be met to warrant administrative payment.

In the case before this court, the *Mammoth Mart* test is relevant under both the chapter 11 and the chapter 7 phases. The business was operated by the debtor-in-possession from the time of the filing until a trustee was appointed on April 1, 1983. Even after the conversion to chapter 7 on June 3, 1983, the trustee's goal was to operate the business so it could be sold as a going concern.

To satisfy part one of the *Mammoth Mart* test, either the debtor-in-possession or the trustee must have induced Equilease to supply the lathes for the use of Armorflite (Maine). The lathes had been in the Kennebunk shop since the fall of 1980, although the consideration was supplied by the Florida corporation, Armorflite Southeast. After Armorflite (Maine) filed its petition in April 1982, Equilease sought relief from the stay to repossess its equipment. When Armorflite (Maine) approached Equilease about retaining the equipment, Equilease officials would not agree to Armorflite (Maine)'s taking over the Southeast leases without a written assumption agreement and a personal guarantee from Armorflite (Maine)'s president. Armorflite (Maine) forwarded neither payments, nor the assumption agreement, nor the guarantee. Therefore, though there was discussion of this debtor's assuming the leases, there was no contract obliging Equilease to leave its equipment on the premises. The lathes, however, remained in Kennebunk for about a year after the assumption negotiations broke down. Equilease did not diligently pursue a relief from stay.

[The] case is ... like a situation in which a creditor has supplied ... a photocopier, before the filing of the petition in bankruptcy .... [T]he mere fact that the debtor continued to use the machine after the petition was filed would not entitle a claim for the price of the copier to § 503 priority.

*In re Jartran, Inc.*, 732 F.2d 584, 589 (7th Cir.1984).

It is likewise unavailing for Equilease to claim it had an implied contract with this debtor from the date of the petition. It is true that when:

one renders services to another at the request, or with the knowledge and consent, of the other, and the surrounding circumstances make it reasonable for him to believe that he will receive payment therefor from the other, and he does so believe, a promise to pay will be inferred, and there is an implied contract.

*Bourisk v. Amalfitano*, 379 A.2d 149, 151 (Me.1977) [citation omitted]. However, in spite of wanting very much to be paid, Equilease had no realistic expectation of payment. The very reason Equilease insisted upon an assumption and guarantee in September 1982 is that it did not reasonably believe it would be paid by this debtor on the Southeast leases.

The only other possible "inducement" for Equilease to leave its machines in Kennebunk arose from a series of negotiations with the chapter 7 trustee in the summer of 1983. After arranging for Equilease to pick up the lathes in late August 1983, the trustee and counsel for Equilease agreed that the lathes would remain in this debtor's shop for an extra week. For the week's use, the trustee paid $500 as a cost of administration. The court finds this figure reasonable, since it is roughly the amount Southeast owed per week on the lease for the one operable lathe. Furthermore, there is a strong presumption that the use of the lathe was beneficial to the estate, as required by part two of the *Mammoth Mart* test. Therefore, the payment was appropriate.

Armorflite (Maine), however, took more than it bargained for in this transaction. When Equilease's rigger arrived in Kennebunk to pick up the lathes after the week's use, Armorflite personnel would not allow repossession until noon of the following day. The trustee ratified this decision. For this extra day of use, demanded by the debtor, it is only fair that some administrative payment be made. Proration of the $500 a week figure results in a fair payment of $100 as rent for the day's use, which benefited the estate.

Finally, the $2070 which Equilease requests as reimbursement for a sum paid its rigger to lay over in Maine during the repossession can also be paid as an administrative expense. The rigger charged Equilease because the layover was unexpected. Administrative priority allowance has been interpreted as a protection for individuals injured by the trustee's or the debtor-in-possession's operation of the business, even though the claims are not a result of transactions necessary to preserve or rehabilitate the estate. " '[A]ctual and necessary costs' should include costs ordinarily incident to operation of a business ...." *Reading Co. v. Brown*, 391 U.S. 471, 483, 88 S.Ct. 1759, 1765, 20 L.Ed.2d 751 (1968) (priority payment is appropriate for tort claims arising from the operation of the business under a debtor-in-possession). *See also Mammoth Mart*, 536 F.2d at 954. Armorflite (Maine)'s employees and the trustee delayed the repossession of the lathes by one day. Since it caused the layover expense, the estate should pay the cost as an administrative expense.

█ In conclusion, the theme of the Bankruptcy Code is equality of distribution among creditors, with certain delineated exceptions. Priority treatment must be based on statutory authority. With a minor exception, the transactions between Equilease and the debtor were based on no express or implied contract. Unfortunately, Equilease, which did not diligently pursue its remedies, cannot now expect priori-

ty payment of amounts due on leases executed with another party.

An appropriate order will be entered.